# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**JANE DOE**, a minor child by and through her guardian and natural parent, **JANE ROE**,

      Plaintiff,

v.

**CHERRY CREEK SCHOOL DISTRICT**;
**RYAN SILVA**, in his individual capacity;
and **KEVIN UHLIG**, in his individual capacity,

      Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Jane Doe,[1] through her attorneys, Laura B. Wolf and Stephen Shaw of Spark Justice Law LLC, alleges as follows:

## I.    JURISDICTION AND VENUE

1.    This action arises under the Constitution and laws of the United States and the State of Colorado and is brought pursuant to Title IX of the Civil Rights Act ("Title IX"), 20 U.S.C. § 1681, 42 U.S.C. § 1983, and C.R.S. § 24-10-106.3.

---

[1] Due to the sensitive nature of the abuse detailed throughout this Complaint and the young ages of the student involved, Plaintiff will be filing a motion requesting permission to proceed under the pseudonym "Jane Doe" and to refer to the student who assaulted Ms. Doe, by pseudonyms. Additionally, although Ms. Roe was not underage at the time of the events described herein, Ms. Doe could obviously and easily be identified were her mother's name to be included in this public pleading. For this reason, Plaintiff's motion requesting permission to proceed under pseudonym will include a request to refer to her mother as "Jane Roe."

2.      Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 because, as is shown more fully in this Complaint, Plaintiff's claims arise under the laws of the United States, namely 20 U.S.C. § 1681 and 42 U.S.C. § 1983.

3.      Because Plaintiff seeks to enforce her rights under 20 U.S.C. § 1681, jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988(b).

4.      This Court has supplemental jurisdiction over Plaintiff's state-law claim for relief pursuant to 28 U.S.C. § 1367, as this claim is substantially related to Plaintiff's federal claims and arises from a common nucleus of operative facts and thus forms part of the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over each of the named Defendants because they either reside in the State of Colorado or they conduct systematic and continuous business within the State of Colorado.

6.      Venue is proper in the United States District Court for the District of Colorado pursuant to either 28 U.S.C. § 1391(b)(1) or (2).  Venue is proper under 28 U.S.C. § 1391(b)(1) because all of the events and omissions alleged herein occurred within the State of Colorado. Venue is also proper under 28 U.S.C. § 1391(b)(2) because at the time of the events and omissions giving rise to this litigation, all of the Defendants resided in Colorado, the state in which the District of Colorado is located.

## II.      PARTIES

7.      Jane Doe is a former student of Defendant Cherry Creek School District's Cherry Creek High School.  Ms. Doe is aged 17 as of the date this Complaint was filed.

8.    At all times relevant to this lawsuit, Ms. Doe was a resident of and domiciled in the state of Colorado.

9.    Defendant Cherry Creek School District ("CCSD") is a public school district in Colorado.  As a recipient of federal funding, CCSD is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).  Cherry Creek High School ("CCHS") is one of the K-12 institutions that comprise CCSD.

10.    Defendant Kevin Uhlig was at all times relevant to this action the Assistant Principal of Cherry Creek High School and a resident of and domiciled in the state of Colorado.

11.    Defendant Ryan Silva was at all times relevant to this action the Principal of Cherry Creek High School and a resident of and domiciled in the state of Colorado.

### III.    FACTUAL ALLEGATIONS

**A.    John Jones Sexually Assaulted Ms. Doe During a Free Period in CCHS's School Day**

12.    During the 2021-2022 school year, Ms. Doe was a freshman at CCHS and between 14 and 15 years old.

13.    Like many other students at CCHS, Ms. Doe had a free period each school day during which time CCHS permitted her to leave campus.

14.    On January 19, 2022, John Jones, another freshman and a CCHS football player, suggested he and Ms. Doe leave campus during their off period.

15.    In response to Mr. Jones's invitation, Ms. Doe expressed concern that the weather was not good outside and stated her desire to stay on school grounds.

16.    Mr. Jones then took Ms. Doe's phone and told her that she could get it back by joining him at a Starbucks near CCHS's campus.

17.     Ms. Doe repeatedly asked for her phone while following Mr. Jones off campus, but Mr. Jones declined to return her phone once they arrived at Starbucks.

18.     Instead, Mr. Jones went into the single-occupant bathroom at Starbucks with Ms. Doe's phone.

19.     Ms. Doe followed Mr. Jones into the bathroom in an effort to retrieve her phone.

20.     Once Ms. Doe was inside the bathroom, Mr. Jones locked the door and began to sexually assault Ms. Doe.

21.     Mr. Jones forcefully pulled down Ms. Doe's pants and underwear and digitally penetrated Ms. Doe's vagina without her consent and despite her resistance.

22.     In an effort to force a penile/vaginal rape, Mr. Jones removed one hand from Ms. Doe's body to expose his penis.

23.     When Mr. Jones loosened his grasp of Ms. Doe, Ms. Doe was able to push Mr. Jones off of her.

24.     Once free, Ms. Doe escaped from the bathroom and the Starbucks.

**B.      Ms. Doe Reported Mr. Jones's Assault and CCHS Did Nothing**

25.     On January 25, 2022, Ms. Doe and her mother, Jane Roe, reported Ms. Doe's sexual assault to School Resource Officer ("SRO") Sarah Joswick and CCHS Dean Kelly Devitt.

26.     Mses. Doe's and Roe's report triggered a criminal investigation into the incident and the subsequent criminal prosecution of Mr. Jones.

27.     In the days and weeks following the sexual assault, Ms. Doe struggled to manage her trauma and fear of unexpectedly encountering Mr. Jones at school.

28.     Just days after the incident and prior to Ms. Doe's report to SRO Joswick, Mr. Jones approached Ms. Doe, grabbed her arm, and attempted to speak with her.

29.     This encounter shook Ms. Doe's sense of safety, as she had no desire to interact with Mr. Jones following his violent sexual assault.

30.     Ms. Doe hoped that CCHS would support her by implementing safety protections upon learning of the assault.

31.     Indeed, CCHS's "Bear Facts" Student Handbook notes several potential grounds for student suspension, expulsion, or denial of admission, including "[b]ehavior on **or off school property** which is **detrimental to the welfare or safety of other pupils** or of school personnel **including behavior which creates a threat of physical harm** to the child or to other children" (emphasis added).

32.     In addition, CCHS employs procedures for handling cases involving criminal prosecutions of students for committing crimes of violence or unlawful sexual behavior.

33.     While criminal charges had not been filed against Mr. Jones as of January 25, 2022, CCHS was on notice at that time that law enforcement was looking into the matter.

34.     However, CCHS failed to implement any protective measures in response to Ms. Doe's report of Mr. Jones's sexual assault.

35.     Even after charges were filed against Mr. Jones on April 5, 2022, CCHS took no steps to protect Ms. Doe from potential or actual contact or danger from Mr. Jones.

36.     On October 18, 2022, Mr. Jones pled guilty to the charge of unlawful sexual contact, no consent, a violation of C.R.S. § 18-3-404(1)(a).

37.    Even after Mr. Jones's conviction, CCHS took no steps to protect Ms. Doe from potential or actual contact or danger from Mr. Jones.

**C.    Ms. Doe Systematically Isolated Herself in an Attempt to Avoid Mr. Jones and Bullying from Other Students**

38.    Because CCHS implemented no protective measures, Ms. Doe was left to protect herself from potential contact with Mr. Jones in the aftermath of her report of his sexual assault.

39.    Upon arriving at school each day around 7:30 a.m., Ms. Doe walked straight to the bathrooms in the East Building to hide in a stall until her first class began at 8:20 a.m.  Ms. Doe began bringing noise canceling headphones and perfume with her to mask the noises and odors caused by others using the bathroom during that time.

40.    Ms. Doe's second-period class was in the West Building across campus, as Mr. Jones knew because he had frequently walked her to this class before the sexual assault.

41.    After the assault, Ms. Doe deliberately changed her route every day to prevent Mr. Jones from learning her pattern of travel.

42.    Ms. Doe began crossing Union Street for her lunch period because she was confident she would not encounter Mr. Jones there, as she knew that he either stayed on campus or traveled in a teammate's car to a more distant location for lunch.

43.    Ms. Doe stopped going to the library at lunch, knowing that Mr. Jones sometimes spent the lunch period there.  As a result, she was not able to use that time to study, as she had done previously.

44.    Ms. Doe also avoided the bathrooms in the West Building around 2:45 p.m., when she knew Mr. Jones used them to change for sports practice.

45.    The last period of Ms. Doe's school day was her "off period," which Mr. Jones also had "off."  This was the same class period during which Mr. Jones had sexually assaulted Ms. Doe on January 19, 2022.

46.    To avoid seeing Mr. Jones during this off period, Ms. Doe began waiting outside her sister's final class until it ended.

47.    By waiting for her sister, Ms. Doe ensured that she would have someone to accompany her to the car after school ended.

48.    Ms. Doe knew that Mr. Jones's grandmother regularly picked him up near her sister's parking spot, so Ms. Doe was careful not to go there alone.

49.    Ms. Doe also avoided CCHS's Stutler Bowl Stadium during track season because Mr. Jones was on the track team.

50.    In addition to fearing unwanted contact with Mr. Jones, Ms. Doe also feared interacting with Mr. Jones's friends and other CCHS students due to bullying and harassment.

51.    In addition to being on the track team, Mr. Jones was also a star football player, as one of the only freshmen on the Varsity team.

52.    Because Mr. Jones was a popular student athlete at CCHS, nearly every day, Mr. Jones's friends or other students would target Ms. Doe for abuse.  Among other things, other students would frequently accuse Ms. Doe of fabricating her allegations or blame her for her own abuse.

53.    Due to this ongoing harassment and bullying, Ms. Doe began to suffer from severe anxiety, PTSD, and depression, manifesting in panic attacks, vomiting, and fainting on more than one occasion.  She also began weeping uncontrollably on a daily or nearly daily basis.

54.    Ms. Doe regularly visited Dean Kelly Devitt for emotional support during the school day.

55.    On more than one occasion, Ms. Doe told Dean Devitt the extent of the bullying she was experiencing.

56.    Despite this notice being provided to CCSD through Dean Devitt, the school district did not implement any protections for Ms. Doe.

**D.    CCSD Refused to Take Any Steps to Protect Ms. Doe Even When Such Actions Were Specifically Requested**

57.    By March 2022, Ms. Roe had become concerned for Ms. Doe's safety in light of CCSD's failure to protect her.

58.    Accordingly, Ms. Roe petitioned the County Court for Arapahoe County for a protection order to prohibit Mr. Jones from having contact with Ms. Doe.

59.    On March 10, 2022, a magistrate judge granted the protection order, which prohibited Mr. Jones from being within 100 yards of Ms. Doe except at school or school functions, where he was prohibited from being within 10 feet of Ms. Doe.

60.    Also on March 10, 2022, Ms. Roe submitted a formal Title IX complaint based on Ms. Doe's inability to fully participate in school.

61.    The very next day, within approximately 24 hours of Ms. Roe's filing the complaint, CCHS Assistant Principal Kevin Uhlig sent Ms. Roe a Notice of Dismissal of Complaint.

62.    In his email transmitting the dismissal, Assistant Principal Uhlig wrote, "Because the conduct did not occur in a school program or activity, this would not be a Title IX violation."

63.     Assistant Principal Uhlig also acknowledged in his email that CCHS had received a copy of the protection order against Mr. Jones.

64.     Ms. Roe was surprised by Defendants' dismissal of her complaint, given that Mr. Jones assaulted Ms. Doe during a school day and while off campus with the school's permission.

65.     Ms. Roe was also surprised by the speed with which Defendants dismissed the complaint.

66.     Despite Defendants' position as set forth in Assistant Principal Uhlig's email that an off-campus sexual assault during school hours was not "in a school program or activity," CCSD has regularly and repeatedly taken the position that students are under the school's control while off-campus during free periods.

67.     For instance, on December 17, 2021, CCHS Principal Ryan Silva sent an email to the greater CCHS community, including students, reminding them that off-campus behavior needed to be consistent with on-campus standards.

68.     Specifically, Defendant Principal Silva's email stated, "We need to continue to make sure behavior is consistent with what we expect of a CCHS student.  That includes all times when we are on campus, off campus, and when we represent Creek at sporting events, travel or other [sic]. . . .  We want our students to be strong scholars, but their character and citizenship are most important."

69.     CCSD has consistently maintained this position even after Mr. Jones's sexual assault on Ms. Doe in January 2022.

70.     On October 11, 2022, Principal Silva sent another email upon receiving reports of students off-campus during free periods "stealing, vandalizing, cursing, vaping, harassing

employees, and leaving trash on the tables at Kings Soopers, Einstein's Bagels, Starbucks, Subway, Mia's Pizza and Dairy Queen."

71.    In response to these reports, Principal Silva threatened that CCHS would be revoking all freshman off-campus privileges if student behavior did not improve within two weeks.

72.    Similarly, on December 13, 2023, CCSD Superintendent Christopher Smith sent an email related to instances of students using derogatory language, including racial slurs.

73.    In that email, Superintendent Smith wrote, "Recently, we have had instances of racist videos that were created off-campus and caused disruption of the learning environment. Students engaging in this type of behavior have and will face consequences. These can range from restorative practices up to suspension and/or expulsion from school."

74.    Superintendent Smith concluded the email with a promise that "we will continue to take steps to ensure our schools are safe places for all."

75.    On April 5, 2022, less than one month after Ms. Roe submitted the Title IX complaint on behalf of her daughter, Mr. Jones was charged as a juvenile with one count of unlawful sexual contact.

76.    CCHS's "Bear Facts" Student Handbook speaks directly to situations where a student has been charged with but not yet convicted of a criminal offense of this nature.

77.    Specifically, the handbook provides that the CCSD Board of Education will "determine whether the student has exhibited behavior that is detrimental to the safety, welfare, and morals of the other students or school personnel and whether educating the student in the school may disrupt the learning environment in the school, provide a negative example for other

students, or create a dangerous and unsafe environment for students, teachers, and other school

personnel."

78.    Even in the absence of a conviction, the handbook explicitly states that suspension

and expulsion are possible forms of discipline for such conduct.

79.    The handbook later sets forth the relevant procedures for the CCSD Board of

Education's determination upon the filing of a juvenile petition.

80.    First, the Board or its designee **must** make a preliminary determination whether to

proceed with an expulsion hearing, based on consideration of factors including whether the student

has engaged in conduct that is detrimental to the safety or welfare of other students and whether

educating the student in school may disrupt the learning environment or create an unsafe

environment for other students.

81.    If the Board determines that grounds for expulsion exist, CCSD is explicitly

authorized to suspend or expel the student.

82.    CCSD is authorized to postpone suspension or expulsion proceedings pending the

outcome of the criminal court proceedings, but if it does then "the student will not be permitted to

return to school during that period."

83.    Following the initiation of Mr. Jones's criminal case, CCHS and CCSD did

nothing to initiate their internal procedures for assessing the level of risk and disturbance to others

or to otherwise determine whether to suspend or expel Mr. Jones.

84.    Meanwhile, in or around the week of May 9, 2022, Mr. Jones violated the civil

protection order on two instances in which Mr. Jones chose to come within inches of Ms. Doe in

the training room where she was being seen by the trainer.

85.    Ms. Roe informed CCHS about Mr. Jones's violation of the civil protection order.

86.    CCHS never disciplined Mr. Jones for these violations of the civil protection order or otherwise enacted protective measures for the benefit of Ms. Doe.

87.    On May 5, 2022, Mr. Jones was arraigned in juvenile court and the presiding judge issued a second protection order as part of the juvenile case.

88.    During the hearing, the judge asked whether Mr. Jones already had an Individual Supervision and Management Plan, or ISMP, with the school.

89.    Mr. Jones's lawyer informed the judge that Mr. Jones did not have an ISMP with CCHS.

90.    Pursuant to Colorado state law, students who have committed sexual offenses **must** be placed on an ISMP, which sets terms and conditions of the student's continued attendance of the school in order to enable the student to succeed and to protect other students.  C.R.S. § 16-11.7-103(4)(i)-(j).

91.    On May 12, 2022, Ms. Roe emailed Dean Devitt to ask whether CCHS's ISMP procedure had been initiated and noted that she had reported two violations of the protection order.

92.    Dean Devitt responded by stating that she had spoken with Defendant Uhlig, who served as CCHS's ISMP coordinator.

93.    Specifically, Dean Devitt wrote, "He learned of your reports yesterday, and reached out to GVPD [Greenwood Village Police Department] about ISMP info.  From what I know, that process is typically initiated through a designee of the courts.  We are notified as a school the parameters [of the] ISMP, and he is waiting on a response or more information."

94.    On May 13, 2022, Ms. Roe met with Principal Silva to express her concerns surrounding the school's failure to take the Title IX complaint seriously and to implement protective measures to support her daughter, Ms. Doe.

95.    During that conversation, Ms. Roe described to Principal Silva the difficulty she had been having working with Assistant Principal Uhlig to protect Ms. Doe.

96.    In particular, Ms. Roe described how, when she asked Assistant Principal Uhlig about the policies and procedures the school was following in investigating Ms. Roe's Title IX complaint and deciding how to protect Ms. Doe, Assistant Principal Uhlig was unable to identify or provide the relevant policies and procedures.

97.    Ms. Roe further told Principal Silva that Assistant Principal Uhlig told her that these policies and procedures were not written down anywhere.

98.    In response, Principal Silva began to explain the process that CCHS would follow in similar cases, in accordance with CCSD policy.

99.    When Ms. Roe asked whether these policies and procedures existed in writing, Principal Silva responded that they did not.

100.    When Ms. Roe questioned what the school would do to support Ms. Doe's remaining at CCHS the following school year, Principal Silva explained that under Title IX, Mr. Jones maintained rights under Title IX just as Ms. Doe did.

101.    Principal Silva then suggested that Ms. Doe consider attending school elsewhere, since she would then be guaranteed to be separated from Mr. Jones.

102.    Principal Silva stated that CCHS could not otherwise ensure Ms. Doe's separation from Mr. Jones until Mr. Jones's criminal case concluded.

103.    Principal Silva insisted that Defendants had done everything possible with the information that it had.

104.    Specifically, Principal Silva stated that Defendants were required to wait until Mr. Jones had been convicted before they could implement an ISMP.

**E.    Mses. Roe and Doe Filed a Second Title IX Complaint, and Defendants Again Ignored It**

105.    Following her meeting with Principal Silva, Ms. Roe asked whether the school would consider the fact that the assault began on campus—namely, when Mr. Jones took Ms. Doe's phone while at the school.

106.    In response, Assistant Principal Uhlig directed Ms. Roe to file a new Title IX complaint including any such details.

107.    On June 29, 2022, Ms. Roe submitted a new Title IX complaint noting that Mr. Jones had taken Ms. Doe's phone while at school and used it to lure her to the off-campus Starbucks, where he then sexually assaulted her.

108.    Once again, Assistant Principal Uhlig sent Ms. Roe a Title IX Notice of Dismissal of Formal Complaint the very next day, on June 30, 2022.

109.    This Notice of Dismissal again stated, "The alleged conduct did not occur in a School District education program or activity."

110.    Separate from her Title IX complaints, on June 29, 2022, Ms. Roe emailed Assistant Principal Uhlig and Principal Silva in an attempt to gather information about the school's efforts to implement the ISMP.

111.    Ms. Roe informed Assistant Principal Uhlig and Principal Silva that the judge in Mr. Jones's criminal proceeding had told her that ISMPs were to be completed by the school district based on the criminal protection order.

112.    Ms. Roe had contacted Assistant Principal Uhlig as he was the school's ISMP Coordinator and she had contacted Principal Silva as he maintained supervisory authority over the school's operations.

113.    Ms. Roe further informed Assistant Principal Uhlig and Principal Silva that it was critical to implement an ISMP prior to the beginning of the upcoming school year.

114.    The reason for this time sensitivity was that Mr. Jones's criminal defense attorney had confirmed that Mr. Jones would attend CCHS for the 2022-23 school year.

115.    One week later, on July 6, 2022, Assistant Principal Uhlig responded that he would not implement an ISMP unless some party from the criminal court system contacted the school.

116.    Assistant Principal Uhlig wrote that "CCHS will implement an updated safety plan in August when students return."

117.    Despite Assistant Principal Uhlig's reference to an "updated" safety plan, no safety plan at all had been put into place prior to this date.

118.    By this time, the 2022-23 school year was scheduled to begin in just over one month.

119.    Despite Assistant Principal Uhlig's email promising unspecified supports for Ms. Doe, Mses. Roe and Doe received no assurance from Defendants that sufficient measures would be implemented to protect Ms. Doe from Mr. Jones or harassment from his group of friends and other students.

**F.      CCHS's Continued Inaction Forced Ms. Doe to Withdraw from CCHS**

120.    On August 10, 2022, Ms. Roe attended a meeting with Assistant Principal Uhlig, Dean Devitt, School Psychologist Nancy Patrick, Ms. Doe's school counselor Shelly Johnson, an attorney for CCSD, and an attorney for Ms. Doe.

121.    The meeting was intended to discuss potential supportive measures for Ms. Doe during the 2022-23 school year.

122.    At the beginning of the meeting, the attendees discussed the protective measures implemented by Defendants for Ms. Doe during the 2021-22 school year.

123.    Dean Devitt stated that Ms. Doe was permitted to leave class for a break at counseling or Dean Devitt's office when needed.

124.    Further, Ms. Doe and Mr. Jones did not have classes together but otherwise attended school together and could see each other on campus and at school events during and outside of class hours.

125.    No additional protective measures were discussed during the meeting.

126.    No additional protective measures were offered by Defendants during the 2021-22 school year.

127.    The attendees also discussed the civil protection order issued on March 24, 2022 and its enforcement.

128.    Ms. Roe delivered copies of this protection order to the SRO and Dean Devitt when it was issued.

129.    Assistant Principal Uhlig revealed that he had had a conversation with Mr. Jones's parents regarding the civil protection order to ensure that Mr. Jones's parents knew about it.

130.    Assistant Principal Uhlig had no similar conversation with Ms. Roe regarding the civil protection order.

131.    Assistant Principal Uhlig also never offered to Ms. Roe to discuss or to implement a safety plan.

132.    Similarly, Assistant Principal Uhlig never discussed any complaint or grievance procedures available to Ms. Doe should Mr. Jones violate the civil protection order.

133.    Assistant Principal Uhlig admitted during the meeting that he had never offered Ms. Doe or her parents a no-contact order with Mr. Jones.

134.    The first time Ms. Roe was presented with a no-contact order was after the August 10, 2022 meeting with school personnel.

135.    School district personnel present at the meeting did not dispute that it was unlikely that Mr. Jones would agree to sign a no-contact order.

136.    However, these personnel said that expectations could be set with Mr. Jones and, if violated, there could be consequences.

137.    Assistant Principal Uhlig explained that those consequences would begin with a "talk."

138.    When the attendees discussed Ms. Roe's initial Title IX complaint, Assistant Principal Uhlig confirmed that no investigation ever took place because the incident took place off campus.

139.    The attendees also discussed the two violations of the civil protection order Ms. Doe reported to the SRO in May 2022.

140.    Assistant Principal Uhlig said that he knew that Mses. Doe and Roe had reported the incidents to the SRO, but that the district attorney had not found anything to substantiate the claims.

141.    The attorney for Mses. Doe and Roe clarified that the district attorney had decided not to pursue a criminal charge for the protection order violations and that that decision was different from a finding that nothing had happened.

142.    In response, Assistant Principal Uhlig repeated that there was nothing to substantiate Ms. Doe's experience.

143.    When asked what process had been followed and whether any investigation had been undertaken by Defendants, Assistant Principal Uhlig stated, "Not much," as the matter had already been reported to the police.

144.    Throughout the meeting, CCSD personnel explained that the standard for proving a violation of Title IX was a high bar and the regulations were complicated.

145.    Assistant Principal Uhlig repeatedly said that if there were an "egregious" incident, CCSD could take disciplinary action.

146.    When asked what incident could be more "egregious" than the sexual assault by Mr. Jones, Assistant Principal Uhlig explained that Mr. Jones was entitled to due process before any disciplinary action could be taken.

147.    No specific and actionable plans for protective measures for Ms. Doe came out of the August 10, 2022 meeting.

148.    Because Mses. Roe and Doe could not know that Ms. Doe would be protected by Defendants, Ms. Doe withdrew her enrollment from CCHS.

149.    Ms. Doe thereafter enrolled at Valor Christian High School, a private school with a hefty annual tuition.

150.    In sum, to ensure that Ms. Doe would not be exposed to Mr. Jones, Ms. Doe was required to leave CCHS while Mr. Jones was permitted to remain a student.

151.    This despite Ms. Doe's residing within CCHS's geographical region and having CCHS as a "home" school, while Mr. Jones resided outside of CCHS's geographical region.

152.    Mr. Jones was admitted to CCHS through a choice or opt-in mechanism and Mr. Jones's father is a coach for the CCHS football team.

153.    Mr. Jones is a highly valuable football player who has contributed greatly to CCHS's football team since he joined in his freshman year.

154.    Since Mr. Jones's freshman year, the Cherry Creek Bruins have had records of 12-2 in the 2021 school year, 12-2 in the 2022 school year, and 13-1 in the 2023 school year.  The Cherry Creek Bruins were ranked first in the state in the 2021 and 2022 school years and second in the 2023 school year.

155.    As of the filing of this Complaint, Mr. Jones had received offers from at least 12 college football programs, including Duke, Georgia Tech, Cornell, and New Mexico State.

156.    Due to Mr. Jones's contributions to the CCHS football team, CCSD was highly motivated to retain him as a student notwithstanding his sexual assault of Ms. Doe.

157.    On October 18, 2022, Mr. Jones pled guilty to one count of unlawful sexual contact in violation of C.R.S. § 18-3-404(1)(a).

158.    Defendants were on notice of Mr. Jones's conviction at that time.

159.     Nevertheless, Defendants never imposed any discipline on Mr. Jones beyond a single football game suspension.

160.     Mr. Jones was never suspended, expelled, or kicked off of the CCHS football team.

161.     Upon information and belief, Mr. Jones is currently finishing his junior year at CCHS as a star football player.

162.     According to one major scouting website, Mr. Jones is currently the second-ranked recruit out of Colorado for the 2025 season.

**G.     CCSD Follows an Official Policy of Deliberate Indifference to Sexual Harassment and Assault**

163.     CCSD has faced numerous instances of sexual harassment and sexual abuse in the recent past that have been publicly revealed, and an unknown number of instances that have not been publicized.

164.     CCSD has consistently failed to respond adequately and with appropriate speed to these incidents.

165.     Over the past decade, CCSD has created, condoned, or ratified a toxic culture that includes a demonstrated pattern of ignoring reports of sexual assault, disbelieving or minimizing reports of sexual harassment or assault, and failing to take available steps to protect victims of sexual harassment or sexual assault from other students.

166.     This toxic culture has resulted in a policy, custom, or practice of deliberate indifference among high-ranking administrators of ignoring reports made by female students and allowing gender violence to flourish and fester.

167.    This policy of indifference is significantly heightened for accused male student athletes and existed before, during, and after the time that Ms. Doe was sexually assaulted by Mr. Jones.

168.    As one example of this indifference, on April 20, 2022, students at several CCSD schools staged a walkout to protest CCSD's taking too long to produce results from a Title IX investigation into an incident that occurred in November 2021 at Grandview High School.  The walkout related to a 16-year-old female student's report that a male student had touched her genitals without her permission, following a campaign of consistent sexual harassment and groping dating back to August 2020.  According to the victim, following the assault, the male student told her, "Your consent means nothing to me."

169.    Authorities charged the male student with misdemeanor unlawful sexual contact in January 2022, indicating that prosecutors believed that there was probable cause to convict.

170.    By the time of the walkout, five months after the underlying incident and three months after criminal charges were filed, CCSD had not yet completed its Title IX investigation.

171.    Further, CCSD had not removed the male student from the school, temporarily or permanently, despite the ongoing criminal prosecution and its pending Title IX investigation.

172.    As a result, the female victim continued to encounter her assaulter during the school day in the hallways and other school settings on an almost daily basis.

173.    Other instances of sexual harassment and sexual assault have been met with similar inaction.

174.     Another female student at Cherokee Trail High School has come forward with allegations that a male student repeatedly touched her and bit her thigh in class. Strikingly, according to this victim, her assaulter *also* told her, "Your consent means nothing to me."

175.     CCSD presented a no-contact order to the Cherokee Trail students, which the assaulter has violated with no consequences. The female victim has stated, "The school has done nothing. He's still in my class. I got put in the corner and he gets to roam the room. I feel like I'm getting the consequences of his actions."

176.     In the aftermath of the CCSD walkout, CCSD Superintendent Chris Smith sent an email to families on April 20, 2022, stating, "During advisory today, some students walked out of the building to raise awareness of sexual assault."

177.     Superintendent Smith's email suggested that the walkout was an attempt to raise awareness surrounding sexual assault generally, noting that "April is Sexual Assault Awareness and Prevention Month." Superintendent Smith's email did not mention or acknowledge that the walkout was in response to CCSD's dilatory response to a specific sexual assault.

178.     Following widespread criticism in response to his email misrepresenting the purpose of the walkout, Superintendent Smith sent a follow-up email the next day.

179.     In his follow-up email, Superintendent Smith acknowledged that "some students" involved in the walkout were focused on a specific Title IX investigation. Superintendent Smith declined to provide any information about the allegation or investigation, "as we have a legal obligation to protect their privacy and provide due process for all students involved."

180.     These are just two examples of a long history of CCSD's custom, policy, or practice of unlawful behavior. *See also, e.g.*, Noelle Phillips, *Prairie Middle School Teacher Faces 31*

*Criminal Charges in Connection with Child Sexual Abuse*, DENVER POST, https://www.denverpost.com/2017/08/28/prairie-middle-school-teacher-criminal-charges-child-sexual-abuse/ (Aug. 28, 2017) (detailing charges against middle school teacher for sustained sexual abuse of five students as well as Grandview High School employee who assaulted student in 2017); Abigail Miller, *Middle School Administrators Face Charges After "SUSPENDING 14-Year-Old Girl Who Said Her Teacher Sexually Assaulted Her and Pressuring Her to Drop Her Claims Because It Would Ruin His Career,"* DAILY MAIL, https://www.dailymail.co.uk/news/article-5266599/School-suspended-girl-saying-teacher-assaulted-her.html (Jan. 13, 2018) (Prairie Middle School principal and assistant principal encouraged 14-year-old victim to recant allegations of sexual assault against later-convicted middle school teacher due to deleterious effects it would have on teacher).

181. The toxic culture within CCSD, CCSD's custom, policy, or practice, of deliberate indifference, and the complete failure of CCSD officials to address sexual misconduct on the part of male students, especially athletes, or to comply with their Title IX responsibilities created a heightened risk that sexual abuse would occur within CCSD's schools, which risk was known and obvious to CCSD officials and repeatedly raised as a concern by students and community members.

182. This hostile culture and policy of indifference, with the clear message that sexual assault is a tolerable part of being in high school, has led to increased sexual violence in CCSD and many, including Ms. Doe, have suffered as a result.

# IV. CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### Violation of Title IX (20 U.S.C. § 1681(a)) — Official Policy of Indifference
### (Plaintiff Against Defendant CCSD)

183.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

184.    CCSD officials, including CCHS administrators, actively created and maintained an official policy, custom, or practice of deliberate indifference to sexual harassment and assault by CCSD students by refusing to respond to such reports until criminal investigation or court intervention occurred, failing to conduct timely Title IX investigations, refusing to conduct Title IX investigations at all where some portion of the conduct occurred off-campus notwithstanding the on-campus effects of such conduct, and fostering an environment of gender discrimination and hostility at school.

185.    This policy, custom, or practice of indifference created a heightened risk of sexual harassment within CCSD schools, and particularly among student athletes, that was known or obvious to administrators.

186.    This policy, custom, or practice of indifference was a proximate cause of Ms. Doe's being subjected to ongoing sexual harassment in the form of (1) a hostile education environment, (2) ongoing harassment perpetrated by Mr. Jones and his classmates, and (3) vulnerability to future harassment by being forced to interact with Mr. Jones and his friends in daily life at CCHS.

187.    The policy, custom, or practice was also a proximate cause of Ms. Doe's being subjected to sexual assault by Mr. Jones during the course of the school day while subject to Defendants' authority in the course of a school activity or program.

188.    The sexual assault and harassment that Ms. Doe suffered was sufficiently severe, pervasive, or objectively offensive that it effectively barred her access to educational opportunities and benefits.

189.    As a direct and proximate result of CCSD's official policy, custom, or practice of deliberate indifference, Ms. Doe suffered damages and injuries for which CCSD is liable.

## SECOND CLAIM FOR RELIEF
### Violation of Title IX (20 U.S.C. § 1681(a)) — Deliberate Indifference to Ms. Doe's Report of Sexual Assault
### (Plaintiff Against Defendant CCSD)

190.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

191.    Beginning in January 2022 and by no later than March 2022, CCSD had actual knowledge that Ms. Doe was a victim of sexual assault and attempted penile/vaginal rape by Mr. Jones, and that she was experiencing an ongoing hostile educational environment due to Mr. Jones's ongoing presence at CCHS, harassment from Mr. Jones and his friends, retaliation by other students for reporting the sexual assault to the school and to police, and a complete lack of safety plan or other mechanisms to ensure her well-being.

192.    CCSD was also on notice of the significant impact that this hostile educational environment was having on her education at CCHS given Mses. Doe's and Roe's ongoing reports to school administrators and Ms. Doe's eventual withdrawal from CCHS.

193.    CCSD acted with deliberate indifference to this notice when it failed to conduct a Title IX investigation into the hostile educational environment or Ms. Doe's vulnerability to further harassment or to take remedial measures to address the hostile educational environment

and prevent further harassment.  CCSD's failure to take any action was clearly unreasonable in light of known circumstances.

194.    The hostile environment and harassment Ms. Doe experienced were sufficiently severe, pervasive, or objectively offensive that they deprived Ms. Doe of access to educational benefits or opportunities and ultimately led her to withdraw from CCHS prior to the 2022-2023 school year.

195.    In addition, Ms. Doe has suffered from anxiety, PTSD, and depression, manifesting in frequent panic attacks, anxiety, uncontrollable weeping, and vomiting, as a result of this hostile educational environment and the institutional indifference she experienced from Defendants.

196.    Ms. Doe has suffered these and other damages as a result of CCSD's violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), as set forth above.

### THIRD CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 — Equal Protection
### (Plaintiff Against Defendant CCSD)

197.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

198.    The discriminatory conduct directed toward Ms. Doe was representative of an official policy, custom, or practice of CCSD and/or was undertaken by an official or officials with final policymaking authority.

199.    Upon information and belief, Principal Silva and Assistant Principal Uhlig each had final policymaking authority with respect to CCHS.

200.    Defendants Silva's and Uhlig's indifference toward female students and parents reporting sexual assault, and their repeated resolve not to open a Title IX investigation or to otherwise take actions to protect victims of sexual assault because (a) part of the conduct occurred

off school grounds (though during school hours) and (b) they had not been so ordered by a court, constituted an official policy, practice, or custom of CCSD.

201.     As a result of CCSD's indifference and its violations of 42 U.S.C. § 1983, Ms. Doe was subjected to differential treatment on the basis of sex and suffered significant damages, both economic and non-economic, as set forth above.

### FOURTH CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 — Equal Protection
### (Plaintiff Against Defendants Silva and Uhlig)

202.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

203.     At all times pertinent to this action, Principal Silva and Assistant Principal Uhlig were acting under the color of state law and their acts and omissions were conducted within the scope of their official duties or employment.

204.     Based upon information they received, Principal Silva and Assistant Principal Uhlig had actual knowledge of Mr. Jones's sexual assault on Ms. Doe and the ongoing hostile educational environment that Ms. Doe was experiencing as a result of her assault.

205.     Nonetheless, Defendants Silva and Uhlig acquiesced in and were deliberately indifferent to Mr. Jones's sexual misconduct and the ongoing hostile educational environment Ms. Doe experienced by refusing to respond reasonably to it, failing to investigate and redress whether Ms. Doe was experiencing a hostile educational environment or whether she was vulnerable to further harassment, failing to investigate and redress additional harassment that Ms. Doe was experiencing, and failing to investigate whether Mr. Jones posed a substantial risk of harm to Ms. Doe or other female students.

206.    The law was clearly established at the time of Defendants Silva's and Uhlig's actions and failures to act such that a reasonable official in their position would have understood that their conduct implicated Ms. Doe's constitutional rights. *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1251 (10th Cir. 1999); *Doe v. Roaring Fork Sch. Dist.*, 2020 WL 7711322, at *4-6 (D. Colo. Dec. 29, 2020).

207.    Ms. Doe has suffered significant damages, both economic and non-economic, as a result of these violations of 42 U.S.C. § 1983, as set forth above.

208.    The acts or omissions of Defendants Silva and Uhlig as described herein were taken maliciously, willfully, or with a reckless or wanton disregard of Ms. Doe's constitutional rights, and Plaintiff is entitled to punitive damages against these Defendants in addition to compensatory, economic, consequential, and special damages.

209.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and pre- and post-judgment interest and costs as allowable by federal law.

### FIFTH CLAIM FOR RELIEF
### Negligence — Claire Davis School Safety Act
### (Plaintiff Against All Defendants)

210.    Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as if set forth fully herein.

211.    At all times pertinent to this action, Principal Silva and Assistant Principal Uhlig were employees of CCSD acting within the scope of their official duties or employment.

212.    Mr. Jones committed or attempted to commit a felony sexual assault against Ms. Doe as defined in C.R.S. § 18-3-402.

213.    Specifically, Mr. Jones both caused and attempted to cause Ms. Doe to submit to sexual intrusion or sexual penetration against her will through the actual application of physical force or physical violence.

214.    Further, Ms. Doe suffered serious bodily injury as a result of Mr. Jones's sexual assault, both in the form of forceful vaginal penetration and through the development of post-traumatic stress disorder symptomatology.

215.    Such conduct by Mr. Jones constituted an "incident of school violence" pursuant to C.R.S. § 24-10-106.3(2)(c).

216.    CCSD had a duty to exercise reasonable care to protect Ms. Doe from harm from acts committed by other individuals, like Mr. Jones, when that harm is reasonably foreseeable, while Ms. Doe was participating in school-sponsored activities.

217.    When Mr. Jones sexually assaulted Ms. Doe through digital penetration against her will, and when he attempted to engage in penile/vaginal rape on Ms. Doe, both students were participating in school-sponsored activities.

218.    By traveling off-campus during school-sanctioned "off" periods during the school day, Mr. Jones and Ms. Doe were both subject to CCSD's supervision and control as the school's permission for students to exit campus during such periods was a school-sponsored activity.

219.    CCSD's repeated communications asserting control over the behavior of students during such "off" periods confirmed the school authority, control, and sponsorship of such activities.

220.    Defendants breached their duty to exercise reasonable care to protect Ms. Doe from reasonably foreseeable harm arising from such an incident of school violence.

221.    Specifically, Defendants failed to exercise control over students during their "off" periods sufficient to forestall such reasonably foreseeable incidents of felony sexual assault while students were off-campus and thus outside the direct supervision of CCSD faculty members.

222.    Further, Defendants failed to prevent Ms. Doe from suffering harm from reasonably foreseeable acts by other students, such as bullying and harassment, arising from an incident of school violence such as Mr. Jones's sexual assault and attempted penile/vaginal rape of Ms. Doe.

223.    Defendants' breach of their duty of care caused Ms. Doe's injuries as a result of Mr. Jones's sexual assault and attempted penile/vaginal rape of Ms. Doe, as well as Ms. Doe's injuries resulting from bullying and harassment by other students.

224.    Ms. Doe has suffered significant damages, both economic and non-economic, as a result of these violations of C.R.S. §24-10-106.3, as set forth above.

225.    The acts or omissions of Defendants Silva and Uhlig as described herein were taken willfully or wantonly.

226.    As a direct and proximate result of Defendants' negligence, Ms. Doe suffered damages and injuries for which Defendants are liable.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment in her favor and against each of the Defendants, and to award her all relief as allowed by law and equity, including, but not limited to, the following:

a)    All appropriate relief at law and equity;

b)    Actual economic damages as established at trial;

c)    All available compensatory, non-economic, consequential, and other damages, including, but not limited to, emotional distress, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, physical injury, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

d)    Punitive damages for all claims allowed by law in amount to be determined at trial;

e)    Pre-judgment and post-judgment interest at the highest lawful rate;

f)    Attorneys' fees and the costs associated with this action as allowed by law, including expert-witness fees; and

g)    Any further relief that this Court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 13th day of March 2024.

Respectfully submitted,

*s/ Stephen Shaw*
Laura B. Wolf
Stephen Shaw
Spark Justice Law LLC
3435 S. Inca Street, Suite C-113
Englewood, CO 80110
(303) 802-5390 (t) / (303) 848-3003 (f)
laura@spark-law.com
steve@spark-law.com

*Attorneys for Plaintiff*