## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:24-cv-00687-NYW-TPO

**JANE DOE**,

      Plaintiff,

v.

**CHERRY CREEK SCHOOL DISTRICT**;
**RYAN SILVA**, in his individual capacity;
and **KEVIN UHLIG**, in his individual capacity,

      Defendants.

---

## THIRD AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Jane Doe,[1] through her attorneys, Laura B. Wolf and Stephen Shaw of Spark Justice Law LLC, alleges as follows:

### I.      JURISDICTION AND VENUE

1.      This action arises under the Constitution and laws of the United States and the State of Colorado and is brought pursuant to Title IX of the Civil Rights Act ("Title IX"), 20 U.S.C. § 1681, 42 U.S.C. § 1983, and C.R.S. § 24-10-106.3.

---

[1] Due to the sensitive nature of the abuse detailed throughout this Third Amended Complaint and the young ages of the students involved, Plaintiff previously filed a motion requesting permission to proceed under the pseudonym "Jane Doe," to refer to her mother as "Jane Roe," and to refer to the student who assaulted Ms. Doe as "John Jones." The Court granted this motion on March 28, 2024. ECF No. 14.

2.      Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1331 because, as is shown more fully in this Third Amended Complaint, Plaintiff's claims arise under the laws of the United States, namely 20 U.S.C. § 1681 and 42 U.S.C. § 1983.

3.      Because Plaintiff seeks to enforce her rights under 20 U.S.C. § 1681, jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988(b).

4.      This Court has supplemental jurisdiction over Plaintiff's state-law claim for relief pursuant to 28 U.S.C. § 1367, as this claim is substantially related to Plaintiff's federal claims and arises from a common nucleus of operative facts and thus forms part of the same case or controversy under Article III of the United States Constitution.

5.      This Court has personal jurisdiction over each of the named Defendants because they either reside in the State of Colorado or they conduct systematic and continuous business within the State of Colorado.

6.      Venue is proper in the United States District Court for the District of Colorado pursuant to either 28 U.S.C. § 1391(b)(1) or (2).  Venue is proper under 28 U.S.C. § 1391(b)(1) because all of the events and omissions alleged herein occurred within the State of Colorado.  Venue is also proper under 28 U.S.C. § 1391(b)(2) because at the time of the events and omissions giving rise to this litigation, all of the Defendants resided in Colorado, the state in which the District of Colorado is located.

## II.      PARTIES

7.      Jane Doe is a former student of Defendant Cherry Creek School District's Cherry Creek High School.  Ms. Doe is aged 18 as of the date this Third Amended Complaint was filed.

8.      At all times relevant to this lawsuit, Ms. Doe was a resident of and domiciled in the state of Colorado.

9.      Defendant Cherry Creek School District ("CCSD") is a public school district in Colorado.  As a recipient of federal funding, CCSD is subject to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681(a).  Cherry Creek High School ("CCHS") is one of the K-12 institutions that comprise CCSD.

10.     Defendant Kevin Uhlig was at all times relevant to this action the Assistant Principal of Cherry Creek High School and a resident of and domiciled in the state of Colorado. Defendant Uhlig has worked for CCHS for the last 18 years, first as a Dean of Students for eight years and then as Assistant Principal for ten years.  Defendant Uhlig has been the Assistant Principal overseeing discipline, safety, and security for the last eight years, during which time he has served as the school's Title IX Coordinator.

11.     Defendant Ryan Silva was at all times relevant to this action the Principal of Cherry Creek High School and a resident of and domiciled in the state of Colorado.  Defendant Silva has been the Principal of CCHS for the last 15 years.

### III.     FACTUAL ALLEGATIONS

**A.      John Jones Sexually Assaulted Ms. Doe During a Free Period in CCHS's School Day and While Subject to Substantial Control by CCSD**

12.     During the 2021-2022 school year, Ms. Doe was a freshman at CCHS and between 14 and 15 years old.

13.     Like many other students at CCHS, Ms. Doe had a free period each school day during which time CCHS permitted her to leave campus.

14.     On January 19, 2022, John Jones, another freshman and a CCHS football player, suggested he and Ms. Doe leave campus during their off period.

15.     In response to Mr. Jones's invitation, Ms. Doe expressed concern that the weather was not good outside and stated her desire to stay on school grounds.

16.     Mr. Jones then took Ms. Doe's phone and told her that she could get it back by joining him at a Starbucks near CCHS's campus.

17.     Ms. Doe repeatedly asked for her phone while following Mr. Jones off campus, but Mr. Jones declined to return her phone once they arrived at Starbucks.

18.     Instead, Mr. Jones went into the single-occupant bathroom at Starbucks with Ms. Doe's phone.

19.     Ms. Doe followed Mr. Jones into the bathroom in an effort to retrieve her phone.

20.     Once Ms. Doe was inside the bathroom, Mr. Jones locked the door and began to violently sexually assault Ms. Doe.

21.     Mr. Jones was much larger and stronger than Ms. Doe, and he held Ms. Doe in place by gripping her body tightly.

22.     Mr. Jones forcefully pulled down Ms. Doe's pants and underwear and violently digitally penetrated Ms. Doe's vagina without her consent and despite her resistance.

23.     Mr. Jones forced Ms. Doe to the ground, positioning himself on top of her and holding her down with both hands and his body weight.

24.     In an effort to force a penile/vaginal rape, Mr. Jones removed one hand from Ms. Doe's body to expose his penis.

25.     When Mr. Jones loosened his grasp of Ms. Doe, Ms. Doe was able to push Mr. Jones off of her.

26.     Once free, Ms. Doe escaped from the bathroom and the Starbucks.

27.     As a result of Mr. Jones's assault, Ms. Doe experienced bruising where he had grasped her body and from being thrown to the ground, as well as scratches, abrasions, and other physical injuries from her struggle while Mr. Jones pinned her to the floor, among other injuries.

28.     In a letter addressed to Ms. Doe, Mr. Jones admitted, "Once I started kissing you and touching you, you asked me to stop, and I didn't.  I sexually abused you by ignoring your request for me to stop.  None of this was your fault, and you never asked for this to happen.  I never had your consent and you never wanted this to happen."

29.     During a mental health evaluation included in Mr. Jones's pre-sentence investigative report, Mr. Jones admitted that he had digitally penetrated Ms. Doe's vagina during the incident on January 19, 2022.

30.     CCSD trains its employees and administrators that any penetration, no matter how slight, of the vagina or anus without consent of the victim is considered sexual assault under the Clery Act and thus subject to Title IX protections.

31.     CCSD had substantial control over Mr. Jones and the context in which the sexual assault occurred at the time of the sexual assault.

32.     In particular, CCSD had required Mr. Jones to consent to this level of control over his conduct in exchange for the privilege of participating in the district's school-sponsored athletics program, including in the football season immediately preceding the sexual assault.

33.     Knowing consent to this level of control was obtained through securing Mr. Jones'
and his mother's signatures on a document entitled "Participation Agreement."

34.     According to Principal Silva, the Participation Agreement allows Defendants to
impose discipline for off-campus behaviors of student athletes, including for conduct such as
consuming alcohol at a house party.

35.     "In exchange for the opportunity to participate in the Cherry Creek School District
No. 5's School Sponsored Athletics and Activities Program," Mr. Jones had agreed "not to engage
in behavior which is detrimental to the safety, welfare or morals of . . . other students" whether on
or off campus.

36.     Mr. Jones agreed that from the day he first participated in a CCSD school-
sponsored athletics and activities program (*i.e.*, a school sport) through the date of his graduation,
this behavioral rule remained in effect at all times "including weekends, vacations, and holidays,
and regardless if the student is on or off school district property."

37.     Put another way, under CCSD policy, the rules and expectations outlined in the
Participation Agreement "are to be followed year-round, 365 days a year."

38.     Sexual assault of a student is detrimental to the safety, welfare, and/or morals of
other students, including the victim of the sexual assault.

39.     Violating this rule should have subjected Mr. Jones to consequences, *i.e.*, discipline.

40.     All such disciplinary decisions under the Participation Agreement were left to the
discretion of the site school principal, here Defendant Silva, or his designee, here Defendant Uhlig
and CCHS Athletics Director Jason Wilkins.

41.     CCSD also exercised substantial control over both Ms. Doe and Mr. Jones and the context of the sexual assault insofar as the conduct leading to the sexual assault began on campus, the two students left campus during an off period with the express permission of the school, and the sexual assault took place at a nearby business.

42.     CCSD openly set expectations for students' off-campus behavior during school hours and imposed discipline for violations of those expectations, including for acting in an inappropriate manner at local businesses near the school's campus.

**B.     Ms. Doe Reported Mr. Jones's Assault and CCHS Failed to Investigate or Provide Reasonable Supportive Measures, In Violation of Title IX and CCSD Policies**

43.     On January 25, 2022, Ms. Doe and her mother, Jane Roe, reported Ms. Doe's sexual assault to School Resource Officer ("SRO") Sarah Joswick and CCHS Dean Kelly Devitt.

44.     Mses. Doe's and Roe's report triggered a criminal investigation into the incident and the subsequent criminal prosecution of Mr. Jones.

45.     The report also should have triggered a concurrent investigation on the part of CCSD under both its Title IX policy and other school policies.

46.     These pertinent policies were included in the Bear Facts Handbook for the 2021-2022 school year.

47.     One of the policies contained in the 2021-2022 Bear Facts Handbook is entitled "Sexual Harassment of Students" and it is labeled AC R-4, which is a reference to CCSD Board policy.  It is followed by a procedure entitled "Sexual Harassment of Students (Grievance Procedure)," which is labeled AC R-5, another reference to a CCSD Board policy.

48.     The CCSD Board has adopted numerous procedures as official policy of the district, including AC R-4 and AC R-5.

49.     These two policies required all reports of sexual harassment to be investigated by the building principal immediately upon a staff member's receipt of such a report during the 2021-2022 school year.

50.     These policies do not include any jurisdictional limitation, such as whether the behavior took place on or off campus, while numerous other policies within the 2021-2022 Bear Facts Handbook make such a distinction.

51.     The policies likewise do not provide for any changes to the investigation procedure or timeline if law enforcement is involved.  Meanwhile, other policies expressly provide for different investigation procedures under such circumstances, including the Student Interrogatories, Searches, and Arrests policy, which specifically details requirements in situations both where law enforcement is and is not involved.

52.     Under these policies as set forth in the 2021-2022 Bear Facts Handbook, an investigation into any report of sexual harassment should be completed within one month after the report of such is made.

53.     These two policies are policies of CCSD, not rules of CCHS.  Of note, both are listed as having been approved by the district's superintendent.

54.     Further, the Sexual Harassment of Students policy expressly states that "[n]otice of this policy shall be circulated to *all district schools and departments* and incorporated in student handbooks" (emphasis added).

55.     Just a few lines above this statement, the policy references the Sexual Harassment of Students (Grievance Procedure) policy, noting that "[s]tudents may file an informal or formal grievance of sexual harassment through use of the accompanying grievance procedure."

56.    In addition to being available on the CCSD Board website under the "Policies" tab, these policies were printed in the 2021-2022 Bear Facts Handbook pursuant to CCSD policy JICDA, which requires all "district, school and classroom rules" to be "clearly and specifically described" and "printed in a handbook or some other publication made available to students" with an effective date subsequent to the handbook's dissemination.

57.    As of the 2021-2022 school year, CCSD had not adopted a separate Title IX policy. Instead, it relied on its Sexual Harassment of Students policy and accompanying grievance procedure to meet its Title IX obligations.  Indeed, the Sexual Harassment of Students policy lists Title IX among other laws in the legal reference section.  Meanwhile, the Sexual Harassment of Students (Grievance Procedure) policy lists the Title IX regulations as its *sole* legal reference.

58.    The 2021-2022 Bear Facts Handbook also includes a copy of a CCSD policy stating that behavior that is detrimental to the welfare, safety, or morals of other people is "expressly prohibited for students participating in interscholastic athletics **on or off school district premises**."  This policy therefore applies to Mr. Jones's off-campus sexual assault of Ms. Doe.

59.    Anyone found to be in violation of this policy "**shall** be subject to appropriate disciplinary sanctions," with the nature of such to be determined by the principal or their designee. In support of such, the policy provides that any allegation of misconduct relating to the rules set forth for athletes "**will** be investigated by coaches and athletic and/or administrative personnel **immediately** or as soon as possible upon receiving a complaint."

60.    Similarly to the Sexual Harassment of Students policy, there is no contemplation of different processes or timing based on law enforcement's involvement in a contemporaneous investigation.

61.     The Bear Facts Student Handbook in effect in the 2021-2022 school year also includes a CCSD policy prohibiting violent and aggressive behavior.  This policy expressly states that it applies to behavior that occurs off of school property.

62.     Pursuant to the clear language of these policies, Defendants had a duty to investigate the sexual assault of Ms. Doe pursuant to both Title IX and CCSD policy.

63.     Despite this duty, Defendants failed to conduct any investigation into Ms. Doe's allegations of sexual assault.

64.     Defendants likewise failed to provide Ms. Doe with adequate supportive measures to preserve her equal access to the education program or activities.

65.     In particular, the one supportive measure offered to Ms. Doe was to leave class at any time to see her dean, Dean Kelly Devitt.  Per Defendants, Dean Devitt was Ms. Doe's "emotional support adult."

66.     Dean Devitt is not a licensed social worker or mental health professional.  However, even if she were, providing a student access to a trusted adult is not a supportive measure for purposes of preserving Ms. Doe's access to her educational environment.

67.     According to Defendant Uhlig – the CCHS Title IX Coordinator for the last eight years – in addition to a "trusted adult," the only other supportive measures available for victims of sexual assault were the following: (a) letting teachers know a student may be struggling and seeing whether they would "potentially" be willing to lighten the academic load; (b) communicating with the victim's guardians to make them aware of the situation; and (c) offering the student a safe spot during off periods to be away from people.

68.     Informing a student's parents of a sexual assault is not a supportive measure for purposes of ensuring a victim maintains equal access to the education program or activities.

69.     Providing a student a safe space to be away from their peers and educational environment is not a supportive measure for purposes of ensuring a victim maintains equal access to the education program or activities.

70.     In turn, the only actual supportive measure CCSD provides to victims of sexual assault is to ask teachers to "potentially" lighten their academic load.

71.     In addition to being unaware of the supportive measures that should be provided to students, Defendants also failed to provide Ms. Doe with adequate (if any) supportive measures because CCSD had adopted a policy, practice, or custom of requiring female victims of sexual assault to proactively propose supportive measures to an adult member of their Student Support Team ("SST") and to initiate all check-in's with their SST, regardless of the age of the victim or their knowledge and awareness of the available supports.

72.     In this case, Dean Devitt expected Ms. Doe to propose supportive measures she needed and to track down Dean Devitt to request said supports.

73.     By contrast, Defendants had an obligation to *offer* supportive measures and to ensure those measures implemented were effective by proactively checking in with the student.

C.      **CCHS Failed to Ensure Ms. Doe's Safety and Wellbeing in the Aftermath of the Sexual Assault**

74.     In the days and weeks following the sexual assault, Ms. Doe struggled to manage her trauma and fear of unexpectedly encountering Mr. Jones at school.

75.     Just days after the incident and prior to Ms. Doe's report to SRO Joswick, Mr. Jones approached Ms. Doe, grabbed her arm, and attempted to speak with her.

76.     This encounter shook Ms. Doe's sense of safety, as she had no desire to interact with Mr. Jones following his violent sexual assault.

77.     Ms. Doe hoped that CCHS would support her by implementing safety protections upon learning of the assault.

78.     However, CCHS failed to implement any protective measures in response to Ms. Doe's report of Mr. Jones's sexual assault.

79.     According to Principal Silva, in a case involving allegations of sexual assault, he would expect CCSD – through his designee, Defendant Uhlig – to conduct a threat assessment.

80.     A threat assessment "would be part of our normal process."

81.     Threat assessments are so common that there are approximately 100 threat assessments undertaken at CCHS each year.

82.     Despite such, Defendant Uhlig, while acting as Principal Silva's designee, never conducted a threat assessment of Mr. Jones.

83.     In his 18 years at CCHS – including eight years as a dean administering discipline directly and eight years as the Assistant Principal overseeing discipline – Defendant Uhlig cannot recall a single instance where a threat assessment was conducted in response to allegations of sexual assault.

84.     Threat assessments are regularly conducted in response to physical threats of a non-sexual nature.

D.     **Defendants' Explanations for Their Failure to Investigate Demonstrate a Widespread Failure to Train or, in the Alternative, a Custom, Policy, or Practice of Deliberate Indifference**

85.     CCSD conducts investigations at each of its schools through its building administrator, or principal.

86.     At all times pertinent to this case, Principal Silva delegated all investigation authority to Defendant Uhlig as the Assistant Principal overseeing discipline, safety, and security, referring to him as his "designee."

87.     Defendant Uhlig then delegated Principal Silva's investigation authority to each of the high school deans including, for purposes of this case, Dean Devitt.

88.     Defendants and their designees have provided inconsistent and inaccurate explanations for CCSD's failure to investigate Ms. Doe's sexual assault.

89.     According to Dean Devitt, no investigation took place because the sexual assault occurred off campus and "we cannot investigate what is not on our campus."

90.     However, according to Assistant Principal Uhlig – Dean Devitt's supervisor – CCSD has "absolutely" investigated conduct that has taken place off campus.

91.     Despite such, Dean Devitt had not been trained to investigate off-campus sexual assaults (or had been trained *not* to investigate such) and, as a result, failed at any time to undertake an investigation into the sexual assault of Ms. Doe.

92.     When making this decision, Dean Devitt was acting as the designee of Mr. Uhlig, who was the designee of Principal Silva, in implementing CCSD policy or practices on behalf of CCHS.

93. Notably, Defendant Uhlig supported the decision not to investigate the sexual assault, although his reasoning was specific to Title IX. In particular, it was his understanding that Title IX's 2020 regulations "**prohibited** CCSD from investigating a sexual assault that took place off campus."

94. Title IX has never prohibited a school district from investigating allegations of sexual assault in any circumstances, including based on the location of the assault. Instead, Title IX provides for specific circumstances where a Title IX investigation *must* be undertaken, while also providing that school districts are welcome to adopt other policies and practices to investigate allegations of sexual harassment, including sexual assault, whether or not these allegations fall under Title IX.

95. At the time Defendant Uhlig made the decision not to investigate Ms. Doe's sexual assault, he had been the Title IX Coordinator for the school district for five years.

96. In this role, Defendant Uhlig was entrusted to oversee Title IX investigations for the entire CCHS student body.

97. At all pertinent times, CCHS has been the largest high school in Colorado, with approximately 4,000 students enrolled per year.

98. Despite the importance of his position, Defendant Uhlig received no specialized training in Title IX separate from that provided to all other administrators and deans, which takes place annually and which lasts for approximately 60-90 minutes.

99. Ultimately, Defendant Uhlig either received inaccurate training or insufficient training, leading to his false belief that Title IX *prohibited* him from undertaking an investigation into Ms. Doe's report.

100.    In addition to the reasons detailed above, Dean Devitt also decided not to conduct an investigation because law enforcement was investigating the matter.

101.    According to Principal Silva, the school district is "not equipped to investigate sexual assaults," and as such, investigations into sexual assault allegations are left to law enforcement.

102.    Pursuant to longstanding guidance and case law interpreting Title IX, school districts are **not** permitted to delegate to law enforcement their responsibility to conduct investigations into sexual assault.  This is true even where a law enforcement investigation is underway.  At most, schools may be able to briefly pause investigations until the fact-finding portion of a criminal investigation has concluded, but they may not wait until the entire criminal case has resolved.

103.    Throughout his 18 years at CCHS – including eight years as a de facto Title IX investigator (as dean) and eight years as the Title IX Coordinator – Defendant Uhlig cannot recall a single instance when CCSD had performed a Title IX investigation after criminal charges had been filed – i.e., after the initial fact-finding portion of the criminal investigation had ended – but before there had been a resolution of the criminal case.

104.    Each of these reasons for Defendants' failure to investigate serves as evidence of a widespread failure to train or, in the alternative, a custom, policy, or practice on the part of CCSD of deliberate indifference to reports of sexual harassment, including sexual assault.

105.    In addition to failing to investigate sexual assaults that occur off campus and/or that are being investigated by law enforcement, Defendants also fail to investigate reports of sexual harassment unless they believe that those reports meet the standards for a Title IX investigation.

106.    For example, if Defendant Uhlig receives a report of a sexual assault that does not fall within Title IX, he would only notify law enforcement, notify the parents, and try to provide supports to the students.  He would not initiate or otherwise conduct an investigation.

107.    As of the time of Ms. Doe's assault, however, CCSD's Sexual Harassment of Students policy required that an investigation be undertaken when any reports of student-on-student sexual harassment were made, defining "sexual harassment" more broadly than under Title IX and including no jurisdictional limit with respect to where the conduct took place.

108.    This policy required building principals to conduct the investigations for their respective schools, a duty principals regularly delegated to their designees.

109.    In this case, Principal Silva had designated his duty to investigate to Assistant Principal Uhlig, who delegated the principal's duty to the school's deans.

110.    Despite this policy, a copy of which was printed in the 2021-2022 Bear Facts Student Handbook, Defendants never trained CCSD administrators or staff on this policy or its accompanying grievance procedure.

111.    Beyond the specific sexual harassment policies, at all pertinent times CCSD has had other policies that would apply to cases of sexual assault.

112.    These include policies providing for investigation and discipline of reports of threatening and violent behavior, of behavior affecting the safety and morals of fellow students, and of the underlying conduct upon the filing of criminal charges.

113.    At all pertinent times, all CCSD training regarding sexual harassment was limited to training under Title IX, without regard to other applicable CCSD policies, including policies with broader application.

114.    This widespread failure to train resulted in CCSD employees being unaware of their obligation to investigate sexual harassment allegations outside of the Title IX context, leaving victims of sexual assault without adequate protections.

115.    And because all or nearly all reports of sexual assault made at CCHS are made by or on behalf of female students, this widespread failure to train discriminatorily impacted the female student body

**E.    Defendants Had Numerous Avenues to Investigate Ms. Doe's Reports and Failed to Do So on Account of a Policy, Practice, or Custom of Requiring Written Reports from Victims Before Commencing an Investigation**

116.    Despite claiming that they were legally precluded from investigating Ms. Doe's reports under Title IX, Defendants have also claimed that they were unable to conduct an investigation because they had not received a written report of the sexual assault from Ms. Doe.

117.    Specifically, CCSD has adopted a policy, practice, or custom of requiring victims of sexual assault to directly report details of their sexual assault to school district personnel even after the district has actual knowledge of the sexual assault through other channels, such as via local law enforcement.

118.    In addition to adopting such policy, practice, or custom, CCSD failed to clearly articulate such policy, practice, or custom to its student body, including Ms. Doe.

119.    Under this policy, practice, or custom, CCSD does not accept oral reports as sufficient to trigger their obligation to investigate, instead requiring a written report.

120.    CCSD failed to clearly articulate its written report requirement to its student body, including Ms. Doe.

121.    Under this policy, practice, or custom, CCSD does not accept written reports from third parties, such as parents, as sufficient to trigger their obligation to investigate, instead requiring a written report directly from the student victim.

122.    CCSD failed to clearly articulate its direct-from-victim written report requirement to its student body, including Ms. Doe.

123.    Dean Devitt admits that this CCSD policy, practice, or custom prevents students from reporting misconduct in certain situations.

124.    Despite knowing that it will lead to underreporting and/or under-investigation, Defendants continue to enforce this policy, practice, or custom of requiring a written report of sexual assault directly from the victim prior to commencing an investigation.

125.    Importantly, there is no dispute that Defendants could have obtained a copy of the police report made to SRO Joswick at any time, which would have at least constituted a written report of the sexual assault.

126.    Defendants, however, never requested the report until six months after the sexual assault, and only in preparation for a meeting with Ms. Doe's mother after the family had retained counsel.

127.    Defendants also do not dispute that they had actual knowledge of Ms. Doe's report sufficient to begin an investigation.

128.    And, at no time was Ms. Doe made aware that her report to SRO Joswick was insufficient to initiate an investigation on the part of CCSD.

129.    Principal Silva considers SROs "to be part of our team," and regularly includes them when using collective pronouns about the school, such as in the phrase "we have investigated the matter."

130.    Defendants also never asked to interview Mr. Jones as to what occurred.  Had they done so, they would have discovered that Mr. Jones had admitted to the sexual assault immediately after its commission.

131.    Despite these avenues for investigation, Defendants insist that they were unable to investigate the sexual assault due to Ms. Doe's failure to submit a written report to Dean Devitt.

132.    Pursuant to this policy, practice, or custom, Defendants unreasonably refuse to investigate reports of sexual assault they receive from their SRO team, orally from the victim, or in oral or written format from third parties, such as the victim's parents.

133.    Defendants have also taken the position that their "inability" to investigate negatively impacted their ability to provide adequate supportive measures to Ms. Doe.

F.    **Ms. Doe Systematically Isolated Herself in an Attempt to Avoid Mr. Jones and Bullying from Other Students, While Defendants Failed to Act**

134.    CCHS implemented no protective measures immediately following the sexual assault report.  At most, Ms. Doe was simply told that she could access Dean Devitt at any time if she was feeling overwhelmed.

135.    As a result, Ms. Doe was left to protect herself from potential contact with Mr. Jones in the aftermath of her report.

136.    Upon arriving at school each day around 7:30 a.m., Ms. Doe walked straight to the bathrooms in the East Building to hide in a stall until her first class began at 8:20 a.m.  Ms.

Doe began bringing noise canceling headphones and perfume with her to mask the noises and odors caused by others using the bathroom during that time.

137.    Ms. Doe's second-period class was in the West Building across campus, as Mr. Jones knew because he had frequently walked her to this class before the sexual assault.

138.    After the assault, Ms. Doe deliberately changed her route every day to prevent Mr. Jones from learning her pattern of travel.

139.    Ms. Doe began crossing Union Street for her lunch period because she was confident she would not encounter Mr. Jones there, as she knew that he either stayed on campus or traveled in a teammate's car to a more distant location for lunch.

140.    Ms. Doe stopped going to the library at lunch, knowing that Mr. Jones sometimes spent the lunch period there.  As a result, she was not able to use that time to study, as she had done previously.

141.    Ms. Doe also avoided the bathrooms in the West Building around 2:45 p.m., when she knew Mr. Jones used them to change for sports practice.

142.    Throughout this time, Defendants had the ability to implement a safety plan or no contact directive that would have directed Ms. Doe and Mr. Jones on how to navigate the CCHS campus so as to avoid seeing each other throughout the school day.

143.    Defendants never offered Ms. Doe this supportive measure, or, in the alternative Defendants never made Ms. Doe aware of how this supportive measure worked so that she could affirmatively request it.

144.    The last period of Ms. Doe's school day was her "off period," which Mr. Jones also had "off." This was the same class period during which Mr. Jones had sexually assaulted Ms. Doe on January 19, 2022.

145.    Although Defendants had complete discretion to withdraw Mr. Jones's off-campus privileges or to change his off period so as not to overlap with Ms. Doe's off period, Defendants took no steps to remove Mr. Jones's off-campus privileges or to change his off period.

146.    As a result, and to avoid seeing Mr. Jones during their shared off period, Ms. Doe began spending her off period waiting outside her sister's final class until it ended.

147.    By waiting for her sister, Ms. Doe ensured that she would have someone to accompany her to the parking lot after school ended.

148.    Ms. Doe knew that Mr. Jones's grandmother regularly picked him up near her sister's parking spot, so Ms. Doe was careful not to go there alone.

149.    Ms. Doe also avoided CCHS's Stutler Bowl Stadium during track season because Mr. Jones was on the track team.

150.    At no time did Defendants or their designees offer Ms. Doe any supportive measures to ensure that she could maintain equal access to her educational environment without interacting with Mr. Jones, thereby causing Ms. Doe to lose access to the education program and activities.

151.    In addition to fearing unwanted contact with Mr. Jones, Ms. Doe also feared interacting with Mr. Jones's friends and other CCHS students due to bullying and harassment.

152.    In addition to being on the track team, Mr. Jones was also a star football player, as one of the only freshmen on the Varsity team.

153.    Because Mr. Jones was a popular student athlete at CCHS, nearly every day, Mr. Jones's friends or other students would target Ms. Doe for physical and other abuse. Among other things, other students would frequently accuse Ms. Doe of fabricating her allegations or blame her for her own abuse.

154.    As examples, students would tease Ms. Doe by stopping her and telling her that Mr. Jones was approaching behind her in order to activate her panic response. Other students would throw things at Ms. Doe while telling her that the assault never happened.

155.    Another student told her during a confrontation in the dean's office, "You're ruining his life. He is going to lose so many offers from this. A bunch of girls at Creek get raped and they don't do anything. Why didn't you just shut up?"

156.    Some students made fun of Ms. Doe for being "easy" enough to sexually assault. One female student told Ms. Doe, "Everybody gets raped or sexually assaulted. It isn't a big deal anymore."

157.    Due to this ongoing harassment and bullying, Ms. Doe began to suffer from severe anxiety, PTSD, and depression, as well as physical injuries in the form of panic attacks, physical sickness, rapid heartbeat, heart palpitations, vomiting, migraines, weight loss, difficulty sleeping, and fainting on more than one occasion. She also began weeping uncontrollably on a daily or nearly daily basis.

158.    On numerous occasions throughout the semester, Ms. Roe informed Dean Devitt and Defendants Uhlig and Silva that Ms. Doe was experiencing significant difficulties at school and at home as a result of the school's failure to protect Ms. Doe at school.

159.    As the only support provided to her was to visit her dean, Ms. Doe regularly left class to visit Dean Devitt for emotional support during the school day.  Often, Dean Devitt was not in her office, was not available to meet, or had other students in her office while meeting with Ms. Doe.  In turn, Ms. Doe received little if any emotional support from Dean Devitt.

160.    Nonetheless, Ms. Doe spent many class periods in Dean Devitt's office, typically multiple times a week or up to daily.  Ms. Doe frequently missed class time during these visits.

161.    Ms. Doe also was regularly absent from school, either because she had been unable to sleep and thus arrived late or because she needed to leave early due to panic attacks and vomiting as a result of the hostile educational environment.

162.    Since Mses. Doe and Roe had informed the school about Mr. Jones's sexual assault, Defendants Uhlig and Silva consistently instructed Mses. Doe and Roe that any concerns about Ms. Doe's school experience should be communicated to Dean Devitt.

163.    Defendants Silva and Uhlig, along with Dean Devitt, also encouraged Ms. Doe to miss class to spend time in Dean Devitt's office, further depriving her of access to her education.

164.    On more than one occasion, Ms. Doe told Dean Devitt the extent of the bullying she was experiencing.

165.    Upon information and belief, Dean Devitt communicated Ms. Doe's reports about the bullying and harassment she was experiencing to Principal Silva and Assistant Principal Uhlig. She would have communicated the harassment to Assistant Principal Uhlig as her direct supervisor and the Title IX Coordinator, and she would have communicated the harassment to Principal Silva under the school's sexual harassment policy.

166.    CCSD trains its employees and administrators that as of August 2020, *all* school employees are considered "responsible employees" under Title IX.

167.    Thus, as of 2022, Dean Devitt was a "responsible employee" under Title IX whose action or inaction to a report of a Title IX violation binds the school district.

168.    Pursuant to her Title IX obligations, Dean Devitt was expected to report bullying and harassment arising from a sexual assault to the Title IX Coordinator.

169.    Separately from Title IX, district policy AC-R-5 in effect during the 2021-2022 school year requires that any report of sexual harassment from a student received by any staff member be forwarded to the principal for investigation.

170.    According to Principal Silva, Dean Devitt "took all steps expected of her" with respect to Ms. Doe and her reports.  As such, both Principal Silva and Assistant Principal Uhlig received the reports of bullying and harassment from Dean Devitt.

171.    On May 13, 2022, Ms. Roe also directly informed Principal Silva of the bullying and harassment Ms. Doe had been experiencing.  Defendant Silva then reported the matter to Defendant Uhlig for him to address on Defendants' behalf.

172.    Despite being made aware of these reports of a hostile educational environment, neither Dean Devitt, Assistant Principal Uhlig, nor Principal Silva ever initiated any investigation into the harassment (including retaliation) on behalf of Ms. Doe, whether under the Title IX process, the Sexual Harassment of Students policy and grievance procedure, or any other policy, regulation, or rule of CCSD.

173.    Despite being made aware of these reports of a hostile educational environment, neither Dean Devitt, Assistant Principal Uhlig, nor Principal Silva ever provided Ms. Doe with additional supportive measures.

174.    It was reasonably foreseeable that Ms. Doe would be subject to bullying and harassment from other students as a result of her report that she had been sexually assaulted by a popular male football player.

175.    Even after Ms. Roe directly informed Defendant Silva of this harassment in May 2022, the school district still did not implement any protections or other supportive measures for Ms. Doe.

176.    Defendants Uhlig and Silva were aware of the risk that Ms. Doe would face bullying, physical abuse, and harassment from other students as a result of her report that she had been sexually assaulted by a popular male football player.

177.    Further, Defendants Uhlig and Silva were aware that Ms. Doe was actually experiencing such bullying, physical abuse, and harassment.

178.    Nevertheless, Defendants Uhlig and Silva took no actions to protect Ms. Doe from this bullying, physical abuse, and harassment.

**G.      CCSD Refused to Take Any Steps to Protect Ms. Doe Even When Such Actions Were Specifically Requested**

179.    In February 2022, Ms. Roe had become concerned for Ms. Doe's safety in light of CCSD's failure to protect her.

180.    Accordingly, Ms. Roe petitioned the County Court for Arapahoe County for a protection order to prohibit Mr. Jones from having contact with Ms. Doe.

181.    At the end of February, the court granted a temporary protection order, which lasted for two weeks.

182.    On March 10, 2022, a magistrate judge extended the protection order to last for one year.  The protection order prohibited Mr. Jones from being within 100 yards of Ms. Doe except at school or school functions, where he was prohibited from being within 10 feet of Ms. Doe.

183.    Also on March 10, 2022, Ms. Roe submitted a formal Title IX complaint based on Ms. Doe's inability to fully participate in school.

184.    The very next day, within approximately 24 hours of Ms. Roe's filing the complaint, Defendant Uhlig sent Ms. Roe a Notice of Dismissal of Complaint.

185.    In his email transmitting the dismissal, Assistant Principal Uhlig wrote, "Because the conduct did not occur in a school program or activity, this would not be a Title IX violation."

186.    These criteria are not the sole criteria applicable to determine whether a Title IX investigation must take place.  No other criteria were referenced, however, in the dismissal notice.

187.    Assistant Principal Uhlig also acknowledged in his email that CCHS had received a copy of the protection order against Mr. Jones.

188.    Ms. Roe was surprised by Defendants' dismissal of her complaint, given that Mr. Jones had assaulted Ms. Doe during a school day and while off campus with the school's permission.

189.    At the time, Mr. Jones was also subject to the Participation Agreement, which gave Defendants authority to discipline Mr. Jones for off-campus behavior – whether during the school day or not – at any time up until his graduation.

190.    Ms. Roe was also surprised by the speed with which Defendants dismissed the
Title IX complaint.

191.    Despite Defendants' position as set forth in Assistant Principal Uhlig's email that
an off-campus sexual assault during school hours was not "in a school program or activity," CCSD
has regularly and repeatedly taken the position that students are under the school's control while
off campus during free periods.

192.    And, even if Defendant Uhlig genuinely believed that Title IX did not apply, there
was no reason not to initiate an investigation into the incident pursuant to other district policies
and practices that applied to off-campus behavior, especially in his role as Assistant Principal in
charge of disciplinary matters.

193.    For instance, on December 17, 2021, Principal Silva sent an email to the greater
CCHS community, including students, reminding them that off-campus behavior needed to be
consistent with on-campus standards.

194.    Specifically, Principal Silva's email stated, "We need to continue to make sure
behavior is consistent with what we expect of a CCHS student.  That includes all times when we
are on campus, off campus, and when we represent Creek at sporting events, travel or other
[*sic*]. . . .  We want our students to be strong scholars, but their character and citizenship are most
important."

195.    CCSD has consistently maintained this position even after Mr. Jones's sexual
assault on Ms. Doe in January 2022.

196.    On October 11, 2022, Principal Silva sent another email upon receiving reports of
students off campus during free periods "stealing, vandalizing, cursing, vaping, harassing

employees, and leaving trash on the tables at Kings Soopers, Einstein's Bagels, Starbucks, Subway, Mia's Pizza and Dairy Queen."

197.    In response to these reports, Principal Silva threatened that CCHS would be revoking all freshman off-campus privileges if student behavior did not improve within two weeks. Further, some students suffered discipline – including suspension – for these off-campus behaviors.

198.    On December 13, 2023, CCSD Superintendent Christopher Smith sent an email related to instances of students using derogatory language, including racial slurs.

199.    In that email, Superintendent Smith wrote, "Recently, we have had instances of racist videos that were created off-campus and caused disruption of the learning environment. Students engaging in this type of behavior have and will face consequences. These can range from restorative practices up to suspension and/or expulsion from school."

200.    Superintendent Smith concluded the email with a promise that "we will continue to take steps to ensure our schools are safe places for all."

201.    In a similar vein, in or around 2019, CCSD expelled a CCHS student for engaging in off-campus speech outside of school hours due to the purported disruption to the learning environment.

202.    There is no dispute that Mr. Jones' sexual assault of Ms. Doe disrupted her learning environment.

203.    In addition to CCSD's consistent assertions of control and supervisory authority over students during their off periods and/or when their off-campus behavior causes a disruption

to the learning environment of other students, CCSD has an obligation to adequately supervise students during the school day.

204.    CCSD students are, by and large, children and teenagers who require supervision as they learn how to interact with others and control their impulses, including harmful and dangerous ones.

205.    When parents send their children to CCSD schools, they are entrusting them to the school for such supervision and protection for the entirety of the school day. *See* 2015 Colo. Sess. Laws 1036 (Claire Davis School Safety Act legislative declaration) ("Parents have a reasonable expectation that when they send their children to a public school that the school and its employees will have taken steps to keep the children safe."); *see also* CCSD Bd. of Educ. Policy JLIA ("During the time the school is responsible for supervision of students, the principal will be responsible for providing direct supervision."). Many parents work during the day and would be unable to supervise their own children for one period during the middle of the day.

206.    Although Ms. Doe's off period was at the end of the day, CCHS staggered its off periods for different students, with some off periods being scheduled during the middle of the school day.

207.    When CCSD included off periods in the schedule at CCHS, it did so understanding that it would result in these students being entirely unsupervised for a portion of the school day during which CCSD had an obligation to supervise and protect them.

208.    According to Principal Silva, off-campus privileges *burden* the school because "[t]here's periods during the day when we are not in direct supervision of our students," and "we can do a better job of keeping our students safe when they're under our direct supervision."

209.    Despite recognizing the dangers of allowing students as young as 14 years old to roam off-campus without direct supervision, CCHS has offered and continues to offer off-campus privileges to its students.

210.    Although CCSD did not know in advance where these students would go or what they would do during their off periods, it was aware that students would be able to go and do what they wanted during these times.

211.    It is unfortunately reasonably foreseeable that, when young teenagers are left wholly without supervision in this manner, sexual assaults will occur.

212.    Historically, Defendants have received far more reports of off-campus sexual assaults than on-campus sexual assaults.

213.    Defendants Uhlig and Silva, who directly oversaw CCHS and its off-period school program, were aware of the dangers posed by such off periods and took no action to ensure effective supervision of students during the school day.

214.    Defendants failed to act in such a manner even though every sexual assault reported to CCHS in at least the last 15 years has been reported by a female student.

215.    Defendants, meanwhile, took significant measures to control the behavior of CCHS students off campus in connection with littering, vaping, and using foul language, among other less serious behaviors.

### F.    CCSD Delegated Its Disciplinary Authority to Defendants Silva and Uhlig, Neither of Whom Took Any Steps to Discipline Mr. Jones or Address Student Safety

216.    CCSD has previously testified, through a 30(b)(6) designee, that the CCSD Board does **not** have responsibilities with respect to day-to-day discipline.  Instead, day-to-day discipline is delegated to the building principal or administrator.

217.    This testimony aligns with CCSD policy JKD-1-R, through which the Board of Education has explicitly delegated to principals the authority to suspend a student for up to five days without involving the school board or other administrators of the district.

218.    According to CCSD's 30(b)(6) designee, "the principals in those buildings or the administrators in those buildings can further delegate – that's not outlined in policy, so that may be a dean, a counselor, a principal to be the primary person who is working with anyone to decide if something is a warning, a removal of a privilege, a suspension, that kind of thing."

219.    Put another way, the principal or building administrator is "formally" delegated authority to suspend, and any delegation on the part of the principal is "a matter of practice" and thus a "factual delegation."

220.    The CCSD Board has ratified and condoned the use of "factual delegations" on the part of its building principals for purposes of day-to-day discipline, including suspensions.

221.    At all pertinent times, the CCHS principal has been Defendant Silva, and Defendant Silva has delegated his authority with respect to discipline to Defendant Uhlig.

222.    Defendant Silva also understood that Defendant Uhlig regularly delegated Mr. Silva's authority over discipline to the deans that Defendant Uhlig directly supervised, and Defendant Silva "trust[ed] Kevin [Uhlig] and/or the deans to make [] decisions" over discipline.

223.    These factual delegations have been recognized, authorized, and accepted or ratified by CCSD.

224.    CCSD has dozens of policies surrounding behavioral expectations for its students, with different options for discipline based on the nature and location of the conduct, with some policies applying to off-campus behavior and others not.

225.    A copy of these policies is included in the Bear Facts Student Handbook, which is updated on an annual basis, with the front cover indicating the school year to which it applies.  The cover also states that it is a handbook for both parents and students.

226.    One section of the handbook is entitled "Discipline, Attendance & Student Policies."  This section includes a printed version of numerous CCSD Board policies, which are indicated by the policy codes.

227.    Under this section, and citing CCSD Board Policy JICDA, CCSD states that the principal "may suspend or recommend expulsion of a student who engages in" the following pertinent behaviors: (a) violation of CCSD's policy on sexual harassment or (b) behavior **on or off** school property that is detrimental to the welfare, safety, or morals of other students or school personnel.

228.    Although CCSD refused to investigate Ms. Doe's report of sexual assault, there is no dispute that the criminal charge itself put Defendants on sufficient notice that Mr. Jones's conduct violated CCSD's policy on sexual harassment.

229.    Specifically, Mr. Jones was charged with unlawful sexual contact, a class one misdemeanor, on April 5, 2022.

230.    The elements of the crime of unlawful sexual contact as charged are: (1) knowingly (2) subjecting a victim to any sexual contact (3) while knowing that the victim does not consent.

231.    These elements meet the definition of "sexual harassment" included in the 2021-2022 Bear Facts Student Handbook as well as the definition of "sexual harassment" under Title IX.

232.    Even after charges were filed against Mr. Jones on April 5, 2022, Defendants took no steps to discipline Mr. Jones.

233.    Defendants failed to do so despite outsourcing all investigations of sexual assault to law enforcement and using a lower burden of proof than that used in criminal investigations.

234.    In addition to these policies, Mr. Jones had also agreed to be bound by the terms of the Participation Agreement in exchange for the privilege of participating in the CCSD athletics program.

235.    Pursuant to the Participation Agreement, Defendants Silva and Uhlig had authority to discipline Mr. Jones for any conduct detrimental to the safety, welfare, and morals of the other students at any time, whether on or off campus and whether during the school day or outside of school hours, including weekends and evenings.

236.    Despite their authority to discipline Mr. Jones under these policies as well as the Participation Agreement, Defendants never disciplined Mr. Jones until after his criminal conviction.

237.    When Mr. Jones was disciplined, the disciplinary notice specifically stated that Mr. Jones was being disciplined for having pled guilty to the crime of unlawful sexual contact, and not for actually having engaged in the underlying misconduct.

238.    While Principal Silva is not involved in or apprised of most day-to-day discipline at CCHS, instead delegating such to Defendant Uhlig, the Doe/Jones matter was a "serious situation" that Principal Silva was directly involved in.

239.    In addition to discipline, Defendants had the authority to take proactive measures to address student safety as soon as Mr. Jones was criminally charged.

240.    The Bear Facts Student Handbook speaks directly to situations where a student has been charged with but not yet convicted of a criminal offense of this nature.

241.    These provisions are mirrored in CCSD Board of Education policy JKD-1.

242.    Specifically, the handbook provides that the CCSD Board of Education will "determine whether the student has exhibited behavior that is detrimental to the safety, welfare, and morals of the other students or school personnel and whether educating the student in the school may disrupt the learning environment in the school, provide a negative example for other students, or create a dangerous and unsafe environment for students, teachers, and other school personnel."

243.    Even in the absence of a conviction, the handbook explicitly states that suspension and expulsion are possible forms of discipline for such conduct.

244.    Despite these policies and procedures, Defendants never conducted a threat assessment or undertook any other measures to determine whether Mr. Jones had exhibited behavior detrimental to the safety, welfare, and morals of other students, including Ms. Doe.

245.    Defendants also never considered whether educating Mr. Jones at CCHS may disrupt the learning environment in the school, provide a negative example for other students, or create a dangerous and unsafe environment for students, teachers, and other school personnel.

246.    Defendants failed to take any of these steps even though Defendant Uhlig believes that sex crimes are one of the types of harms that could have a "substantial impact to safety and security" at the school.

247.    Instead, pursuant to custom or practice, Defendants take no steps to discipline or otherwise address sexual misconduct until after a criminal case is fully adjudicated.

248.    According to Defendant Silva, "we needed to wait for it to go through the legal system" before being able to take disciplinary action.

249.    This understanding is incorrect under CCSD's written policies.

250.    However, this position reflects the practice and custom of CCSD, as Defendant Silva took direction as to how to address the Doe/Jones situation – including when to impose discipline – directly from the district's legal department.  He did so to ensure consistency within the district, meaning that any advice he received was consistent with districtwide practices.  And although Principal Silva had the discretion not to follow the advice he received, he never exercised that discretion.

251.    The handbook also sets forth the relevant procedures for the CCSD Board of Education's obligations upon the filing of a juvenile petition.

252.    First, the Board or its designee **must** make a preliminary determination whether to proceed with an expulsion hearing, based on consideration of factors including whether the student has engaged in conduct that is detrimental to the safety or welfare of other students and whether educating the student in school may disrupt the learning environment or create an unsafe environment for other students.

253.    If the Board or its designee determines that grounds for expulsion exist, CCSD is explicitly authorized to suspend or expel the student.

254.    CCSD is authorized to postpone suspension or expulsion proceedings pending the outcome of the criminal court proceedings, but if it does then "the student will not be permitted to return to school during that period."

255.    Pursuant to CCSD's delegation of authority and its practice, to commence an expulsion proceeding, the site administrator or principal must refer the matter to the district for expulsion.  The CCSD Board only becomes involved in the expulsion process if there is an appeal.

256.    Principals are permitted to delegate this authority in practice or fact, which Principal Silva did here, by delegating to Mr. Uhlig the ability to recommend or refer a matter for expulsion.

257.    In addition to delegating such, Principal Silva also actively participates in deciding whether to recommend or refer matters for expulsion.

258.    In Defendant Uhlig's 18 years at CCHS, he is unaware of any instance in which CCSD has held an expulsion review without its having been requested by the appropriate administrator at the high school, either Principal Silva or himself.

259.    Over his 18 years at CCHS, including 16 years in roles overseeing discipline, Defendant Uhlig cannot recall a single expulsion being undertaken on account of sexual misconduct.

260.    Over his 18 years at CCHS, including 16 years in roles overseeing discipline, Defendant Uhlig cannot recall a single instance where a student has been subject to emergency removal from the educational environment for a sexual assault.

261.    Over his 18 years at CCHS, including 16 years in roles overseeing discipline, Defendant Uhlig could recall there being numerous reports of student-on-student sexual assaults.

262.    Following the filing of Mr. Jones's criminal case, CCHS and CCSD did nothing to initiate their internal procedures for assessing the level of risk and disturbance to others or to otherwise determine whether to suspend Mr. Jones or to recommend him for expulsion.

263.     CCHS and CCSD also permitted Mr. Jones to attend CCHS pending the outcome of the criminal proceedings despite the nature of the allegations.

264.     The only individuals with authority to determine whether CCHS and CCSD would initiate their internal procedures to consider the proper treatment of Mr. Jones were Defendants Uhlig and Silva.

265.     Accordingly, Defendants Uhlig and Silva acted as the Board of Education's designees in the area of deciding whether to conduct a risk/threat assessment and consider further discipline after Mr. Jones was criminally charged with unlawful sexual behavior, as set forth in the Board of Education's and CCSD's policies.

266.     As the individuals entrusted with making these decisions by the Board of Education, Defendants Uhlig and Silva were final policymakers with respect to decisions regarding investigation and discipline up to suspension following a CCHS student's unlawful sexual behavior.  Defendants Uhlig and Silva also acted as final policymakers with respect to deciding whether to refer or recommend Mr. Jones for expulsion.

267.     Defendants Uhlig and Silva permitted Mr. Jones to return to the CCHS campus throughout the pendency of the criminal case.

268.     Defendants Uhlig and Silva permitted Mr. Jones to return to the CCHS campus throughout this time in violation of CCSD Board policy.

269.     In or around the week of May 9, 2022, Mr. Jones violated the civil protection order on two instances in which Mr. Jones chose to come within inches of Ms. Doe in the training room where she was being seen by the trainer.

270.     Ms. Roe informed CCHS about Mr. Jones's violation of the civil protection order.

271.    CCHS never disciplined Mr. Jones for these violations of the civil protection order or otherwise enacted protective measures for the benefit of Ms. Doe.

272.    On May 5, 2022, Mr. Jones was arraigned in juvenile court and the presiding judge issued a criminal protection order as part of the juvenile case.

273.    Mr. Jones also violated the terms of the criminal protection order when he came within inches of Ms. Doe in the training room twice the following week.  Again, Defendants failed to take any action.

274.    During the May 5, 2022 hearing, the judge asked whether Mr. Jones already had an Individual Supervision and Management Plan, or ISMP, with the school.

275.    Mr. Jones's lawyer informed the judge that Mr. Jones did not have an ISMP with CCHS.

276.    Pursuant to Colorado state law, students who have committed sexual offenses **must** be placed on an ISMP, which sets terms and conditions of the student's continued attendance of the school in order to enable the student to succeed and to protect other students.  C.R.S. § 16-11.7-103(4)(i)-(j).

277.    On May 12, 2022, Ms. Roe emailed Dean Devitt to ask whether CCHS's ISMP procedure had been initiated and noted that she had reported two violations of the protection order.

278.    Dean Devitt responded by stating that she had spoken with Defendant Uhlig, who served as CCHS's ISMP coordinator.

279.    Specifically, Dean Devitt wrote, "He learned of your reports yesterday, and reached out to GVPD [Greenwood Village Police Department] about ISMP info.  From what I know, that

process is typically initiated through a designee of the courts. We are notified as a school the parameters [of the] ISMP, and he is waiting on a response for more information."

280.    On May 13, 2022, Ms. Roe met with Principal Silva to express her concerns surrounding the school's failure to take the Title IX complaint seriously and to implement protective measures to support her daughter, Ms. Doe.

281.    During that conversation, Ms. Roe described to Principal Silva the difficulty she had been having working with Assistant Principal Uhlig to protect Ms. Doe.

282.    In particular, Ms. Roe described how, when she asked Assistant Principal Uhlig about the policies and procedures the school was following in investigating Ms. Roe's Title IX complaint and deciding how to protect Ms. Doe, Assistant Principal Uhlig was unable to identify or provide the relevant policies and procedures.

283.    Ms. Roe further told Principal Silva that Assistant Principal Uhlig told her that these policies and procedures were not written down anywhere.

284.    In response, Principal Silva began to explain the process that CCHS would follow in similar cases, in accordance with CCSD policy.

285.    When Ms. Roe asked whether these policies and procedures existed in writing, Principal Silva responded that they did not.

286.    When Ms. Roe questioned what the school would do to support Ms. Doe's remaining at CCHS the following school year, Principal Silva explained that Mr. Jones retained rights under Title IX just as Ms. Doe did.

287.    Principal Silva then suggested that Ms. Doe consider attending school elsewhere, since she would then be guaranteed to be separated from Mr. Jones.

288.    Principal Silva stated that CCHS could not otherwise ensure Ms. Doe's separation from Mr. Jones until Mr. Jones's criminal case concluded.

289.    Principal Silva insisted that Defendants had done everything possible with the information that it had.

290.    Specifically, Principal Silva stated that Defendants were required to wait until Mr. Jones had been convicted before they could implement an ISMP.

291.    These assertions were both factually and legally untrue.

292.    During this meeting, Ms. Roe also informed Principal Silva that Ms. Doe had been subject to bullying and harassment on the part of her classmates in relation to her having reported the sexual assault.

293.    Principal Silva promptly communicated with Defendant Uhlig regarding the bullying and harassment, expecting Defendant Uhlig to take appropriate remedial action.

294.    Principal Silva never followed up to determine whether Defendant Uhlig ever took such action, which he did not.

**H.    Mses. Roe and Doe Filed a Second Title IX Complaint, and Defendants Again Ignored It**

295.    Following her meeting with Principal Silva, Ms. Roe asked whether the school would consider the fact that the assault began on campus—namely, when Mr. Jones took Ms. Doe's phone while at the school.

296.    In response, Assistant Principal Uhlig directed Ms. Roe to file a new Title IX complaint including any such details.

297.    On June 29, 2022, Ms. Roe submitted a new Title IX complaint noting that Mr. Jones had taken Ms. Doe's phone while at school and used it to lure her to the off-campus Starbucks, where he then sexually assaulted her.

298.    Once again, Assistant Principal Uhlig sent Ms. Roe a Title IX Notice of Dismissal of Formal Complaint the very next day, on June 30, 2022.

299.    This Notice of Dismissal again stated, "The alleged conduct did not occur in a School District education program or activity."

300.    The Notice of Dismissal also added a new basis for dismissal, specifically that "[s]pecific circumstances exist that prevent the School District from gathering evidence sufficient to reach a determination."

301.    Defendants contend that they were prevented from gathering evidence because Ms. Roe had asked that Ms. Doe not be interviewed about the sexual assault so as to minimize retraumatization.  According to Defendants, this precluded them from investigating the sexual assault allegations.

302.    At this time, Defendants had adopted a policy, practice, or custom of requiring students to directly make reports of sexual assault to school personnel if they wished the school to investigate.  These reports had to be made by the student and be submitted in writing.

303.    At no time did Defendants or any other person inform Mses. Doe or Roe of this policy, practice or custom – the terms of which violate Title IX – nor did they ever indicate that they could not proceed with an investigation unless Ms. Doe (as opposed to Ms. Roe) signed the Title IX complaint form.

304.    Separate from her Title IX complaints, on June 29, 2022, Ms. Roe emailed Assistant Principal Uhlig and Principal Silva in an attempt to gather information about the school's efforts to implement the ISMP.

305.    Ms. Roe informed Assistant Principal Uhlig and Principal Silva that the judge in Mr. Jones's criminal proceeding had told her that ISMPs were to be completed by the school district based on the criminal protection order.

306.    Ms. Roe had contacted Assistant Principal Uhlig as he was the school's ISMP Coordinator and she had contacted Principal Silva as he maintained supervisory authority over the school's operations.

307.    Ms. Roe further informed Assistant Principal Uhlig and Principal Silva that it was critical to implement an ISMP prior to the beginning of the upcoming school year.

308.    The reason for this time sensitivity was that Mr. Jones's criminal defense attorney had confirmed that Mr. Jones would attend CCHS for the 2022-23 school year.

309.    One week later, on July 6, 2022, Assistant Principal Uhlig responded that he would not implement an ISMP unless some party from the criminal court system contacted the school.

310.    Assistant Principal Uhlig wrote that "CCHS will implement an updated safety plan in August when students return."

311.    Despite Assistant Principal Uhlig's reference to an "updated" safety plan, no safety plan at all had been put into place prior to this date.

312.    On July 12, 2022, a court-appointed guardian ad litem for Mr. Jones emailed CCHS to inquire whether it was accurate that CCHS would not implement an ISMP during the pendency of a criminal case for unwanted sexual contact.

313.    On July 14, 2022, CCSD's general counsel, Sonja McKenzie, responded that "it would be inappropriate to implement an ISMP pre-adjudication."

314.    Ms. McKenzie continued, "However, other strategies can be used by schools to manage behavior pre-adjudication.  Those include no contact agreements between an alleged perpetrator and an alleged victim initiated by the school."

315.    On July 15, 2022, Ms. McKenzie further stated to Mr. Jones's guardian ad litem, "It is also my understanding that a no contact agreement was also offered, but declined."

316.    However, a no-contact agreement had not been offered by the school by that time.

317.    At this point in time, the 2022-23 school year was scheduled to begin in just over one month.

318.    Despite Assistant Principal Uhlig's July 6, 2022 email promising unspecified supports for Ms. Doe, Mses. Roe and Doe received no assurance from Defendants that sufficient measures would be implemented to protect Ms. Doe from Mr. Jones or harassment from his group of friends and other students.

**I.    CCHS's Continued Inaction Forced Ms. Doe to Withdraw from CCHS**

319.    On August 10, 2022, Ms. Roe attended a meeting with Assistant Principal Uhlig, Dean Devitt, School Psychologist Nancy Patrick, Ms. Doe's school counselor Shelly Johnson, an attorney for CCSD, and an attorney for Ms. Doe.

320.    The meeting was intended to discuss potential supportive measures for Ms. Doe during the 2022-23 school year.

321.    At the beginning of the meeting, the attendees discussed the protective measures implemented by Defendants for Ms. Doe during the 2021-22 school year.

322.    As the primary support, Dean Devitt stated that Ms. Doe was permitted to leave class for a break at counseling or Dean Devitt's office whenever needed, without limitation as to duration or frequency.

323.    This "support" was offered even though CCSD believes that "[a]ttendance is an integral part of the educational process" and that students who are absent from class "miss experiences that cannot be recreated through makeup assignments or short discussions with the teacher." According to CCSD, "The correlation between student performance and attendance is vital."

324.    Under Title IX, supportive measures are required to be measures that preserve or restore a student's equal access to the education program or activities.

325.    According to Defendants, accessing class is a foundational form of accessing the education program.

326.    By providing Ms. Doe a "supportive" measure that allowed for her to consistently miss class, Defendants failed to provide Ms. Doe a supportive measure under Title IX.

327.    This "support" was offered even though Defendants were aware that it was already not working to preserve or restore Ms. Doe's equal access to the education program or activities.

328.    Ms. Doe had been offered this "support" ever since notifying Dean Devitt of the sexual assault, and Ms. Roe had consistently informed Dean Devitt and Assistant Principal Uhlig throughout the semester that Ms. Doe was continuing to experience distress, physical symptoms, and educational difficulties.

329.    Further, while Ms. Doe and Mr. Jones did not have classes together, they otherwise attended school together and could see each other on campus and at school events during and outside of class hours.

330.    No additional supportive or protective measures were offered during the meeting, including measures to account for these potential interactions.

331.    Similarly, no additional supportive or protective measures had been offered by Defendants during the 2021-22 school year.

332.    The attendees also discussed the civil protection order initially issued on February 24, 2022 and its enforcement.

333.    Ms. Roe delivered copies of this protection order to the SRO and Dean Devitt when it was issued.

334.    Assistant Principal Uhlig revealed that he had had a conversation with Mr. Jones's parents regarding the civil protection order to ensure that Mr. Jones's parents knew about it.

335.    Assistant Principal Uhlig had no similar conversation with Ms. Roe regarding the civil protection order.

336.    Assistant Principal Uhlig also never offered to Ms. Roe to discuss or to implement a safety plan or no-contact order.

337.    Similarly, Assistant Principal Uhlig never discussed any complaint or grievance procedures available to Ms. Doe should Mr. Jones violate the civil protection order.

338.    Indeed, Defendant Uhlig never once met with Ms. Doe at any time, despite his role as Title IX Coordinator and his obligation to meet with Ms. Doe upon her report of a sexual assault.

339. Assistant Principal Uhlig also admitted during the meeting that he had never offered Ms. Doe or her parents a no-contact order with Mr. Jones.

340. The first time Ms. Roe was presented with a no-contact order was after the August 10, 2022 meeting with school personnel.

341. School district personnel present at the meeting did not dispute that it was unlikely that Mr. Jones would agree to sign a no-contact agreement.

342. However, these personnel said that expectations could be set with Mr. Jones and, if violated, there could be consequences.

343. Assistant Principal Uhlig explained that those consequences would begin with a "talk."

344. As of August 2024, Mr. Jones did not recall a no-contact agreement ever being presented to him at any point.

345. As of the same month, Mr. Jones's father likewise did not recall CCSD ever presenting a no-contact agreement to Mr. Jones or to his parents.

346. At all pertinent times, it was the policy, custom, or practice of CCSD to offer, at most, no-contact **agreements**, as opposed to no-contact directives or orders, to students accused of sexual assault.

347. This policy, practice, or custom had a disparate impact on female students as the primary victims of sexual assault.

348. When the attendees discussed Ms. Roe's initial Title IX complaint, Assistant Principal Uhlig confirmed that no investigation ever took place because the incident took place off campus.

349.    The attendees also discussed the two violations of the civil protection order Ms.
Doe reported to the SRO in May 2022.

350.    Assistant Principal Uhlig said that he knew that Mses. Doe and Roe had reported
the incidents to the SRO, but that the district attorney had not found anything to substantiate the
claims.

351.    The attorney for Mses. Doe and Roe clarified that the district attorney had decided
not to pursue a criminal charge for the protection order violations and that that decision was
different from a finding that nothing had happened.

352.    In response, Assistant Principal Uhlig repeated that there was nothing to
substantiate Ms. Doe's experience.

353.    Throughout the meeting, CCSD personnel explained that the standard for proving
a violation of Title IX was a high bar and the regulations were complicated.

354.    When asked what process had been followed and whether any investigation had
been undertaken by Defendants, Assistant Principal Uhlig stated, "Not much," as the matter had
already been reported to the police.

355.    Assistant Principal Uhlig repeatedly said that if there were an "egregious" incident,
CCSD could take disciplinary action.

356.    When asked what incident could be more "egregious" than the sexual assault by
Mr. Jones, Assistant Principal Uhlig explained that Mr. Jones was entitled to due process before
any disciplinary action could be taken.

357.     Notably, CCSD trains its employees and administrators that on the "spectrum" of sexual/gender harassment, the worst harassment is "[p]hysical force, sexual fondling, forced sodomy, **unlawful sexual contact**, [and] sexual penetration."

358.     No specific and actionable plans for protective measures for Ms. Doe came out of the August 10, 2022 meeting.

359.     Because Mses. Roe and Doe could not know that Ms. Doe would be protected by Defendants, Ms. Doe withdrew her enrollment from CCHS and the school district more broadly.

360.     Ms. Doe thereafter enrolled at Valor Christian High School, a private school with a hefty annual tuition.

361.     In sum, to ensure that Ms. Doe would not be exposed to Mr. Jones, Ms. Doe was required to leave CCHS while Mr. Jones was permitted to remain a student.

362.     This despite Ms. Doe's residing within CCHS's geographical region and having CCHS as a "home" school, while Mr. Jones resided outside of CCHS's geographical region.

363.     Mr. Jones was admitted to CCHS through a choice or opt-in mechanism and Mr. Jones's father is a coach for the CCHS football team.

364.     Mr. Jones is a highly valuable football player who has contributed greatly to CCHS's football team since he joined in his freshman year.

365.     Since Mr. Jones's freshman year, the Cherry Creek Bruins have had records of 12-2 in the 2021 school year, 12-2 in the 2022 school year, and 13-1 in the 2023 school year. The Cherry Creek Bruins were ranked first in the state in the 2021 and 2022 school years and second in the 2023 school year. The Bruins again won the state championship in the 2024 school year.

366.    As of the filing of the initial Complaint, Mr. Jones had received offers from at least

12 college football programs, including Duke, Georgia Tech, Cornell, and New Mexico State.  He

has since committed to Washington State.

367.    Due to Mr. Jones's contributions to the CCHS football team, CCSD was highly

motivated to retain him as a student notwithstanding his sexual assault of Ms. Doe.

**J.    Defendants' Delayed Discipline of Mr. Jones Has Been Minimal and Well After Ms. Doe Was Forced to Transfer Out of CCSD**

368.    On October 18, 2022, Mr. Jones pled guilty to one count of unlawful sexual

contact in violation of C.R.S. § 18-3-404(1)(a).

369.    Defendants were on notice of Mr. Jones's conviction at that time.

370.    Nevertheless, the only discipline Defendants imposed on Mr. Jones was a four-day

suspension.

371.    Mr. Jones was also required to sit out one football game because it fell during the

period of his suspension, when he was prohibited from being on campus or participating in school

activities.

372.    Mr. Jones's suspension was imposed in response to his having pled guilty to a

crime, and not for the underlying sexual assault that he committed against Ms. Doe.

373.    Assistant Principal Uhlig was the individual who actually decided to suspend Mr.

Jones for four days in response to Mr. Jones's guilty plea.

374.    In so deciding, Assistant Principal Uhlig was acting under Principal Silva's

delegated authority to suspend students for up to five days.

375.    Specifically, Principal Silva was personally involved in the Doe/Jones matter and kept apprised as to all disciplinary decisions, which he either approved in advance or ratified after the fact.

376.    Assistant Principal Uhlig previously served as a coach for CCHS's track and football teams, the two sports that Mr. Jones participates in at CCHS.

377.    In an October 28, 2022 email to Mr. Jones's mother, Assistant Principal Uhlig stated, "Assuming there is [sic] no additional legal charges related to the specific [Doe] case, [Mr. Jones] will suffer no additional CCHS/CCSD consequences.  My hope is we move forward without any further issues."

378.    Assistant Principal Uhlig made this statement despite the fact that Defendants never investigated Mr. Jones's conduct and instead relied exclusively on the guilty plea to determine appropriate discipline.

379.    Mr. Jones was not independently suspended from any football games or activities as a result of his conduct, including his violation of the Participation Agreement.

380.    Mr. Jones was never expelled or removed from the CCHS football team.

381.    In fact, Defendants never directly informed CCHS's Athletic Director ("AD"), Jason Wilkins, about Ms. Doe's report that Mr. Jones had sexually assaulted her.

382.    Instead, AD Wilkins learned about Mr. Jones's conduct when Ms. Roe included him on an email on May 5, 2022, to CCHS administrators asking that Mr. Jones's athletic eligibility be investigated in accordance with CCSD's written policy.

383.    When Mr. Wilkins inquired as to what occurred, Defendants downplayed Mr. Jones's conduct, falsely claiming that he had engaged in "inappropriate touching" of Ms. Doe.

384.    Defendants likewise failed to correct this inaccurate narrative when Mr. Wilkins restated it in an email to legal counsel in which he sought business advice as to how to approach next steps.

385.    CCSD Board of Education policy JJI states, "The determination to impose sanctions related to participation in interscholastic athletics and the nature of the sanctions to be imposed shall be made by the principal or his or her designee of the student's school."

386.    Policy JJI further incorporates policy JJI-R, which establishes as a condition of eligibility to participate in interscholastic sports that "[i]n the judgment of the principal, the student is representative of the school's ideals in matters of conduct, citizenship, and sportsmanship."

387.    Despite receiving notice in May 2022 of Ms. Doe's report that Mr. Jones had sexually assaulted her, CCHS's athletics department never investigated the allegations against Mr. Jones to determine whether his eligibility should be reconsidered.

388.    Despite receiving notice in October 2022 that Mr. Jones pled guilty to committing the sexual assault, CCHS's athletics department never investigated the allegations against Mr. Jones to determine whether his eligibility should be reconsidered.

389.    Defendants Uhlig and Silva also intentionally misrepresented what happened or, in the alternative, failed to correct Mr. Wilkins's belief that Mr. Jones engaged in "inappropriate touching" as opposed to a sexual assault.

390.    None of Mr. Jones's coaches or other members of the athletics department ever spoke with Mr. Jones about his actions or the potential for consequences.

391.    Neither did Mr. Jones's coaches or other members of the athletics department ever speak with Mr. Jones's parents about his actions or the potential for consequences.

392.    Neither Mr. Jones nor his parents were ever notified of any investigation by the athletics department.

393.    Similarly, neither Defendants nor the athletics department ever notified the Colorado High School Athletics Association ("CHSAA") of the allegations against Mr. Jones.

394.    Mr. Jones never faced any consequences imposed by the athletics department.

395.    Mr. Jones also never faced any consequences on the part of CHSAA.

396.    CCSD policy provides that students may be suspended or removed from participation in athletics independently of any other discipline they may face from the school or school district.

397.    Other students have faced suspensions or removals from participation in athletics for much less serious conduct than Mr. Jones committed and, specifically, for non-sexual misconduct.

398.    Two football players were suspended for one game for fighting with each other.

399.    Another football player was suspended for at least one game during the 2022-2023 school year for accidentally bringing a knife to the airport.

400.    During or prior to the 2022-2023 school year, at least one student was removed from the football team and lost athletic eligibility for a full season for going out past curfew while on an out-of-state athletic trip.

401.    Mr. Jones was only suspended from school, never from playing football.

402.    He happened to miss a single football game only because being suspended from school disallows students from participating in any school activities, including sports.

403.    Mr. Jones's suspension arose solely from his guilty plea, and not from the underlying conduct leading to the plea.

404.    In late January 2023, Rena Hodge, a court-appointed diversion therapist for Mr. Jones, contacted Principal Silva to schedule an ISMP meeting for Mr. Jones.

405.    Two days later, Principal Silva added Assistant Principal Uhlig to the email chain to schedule the meeting.

406.    Four days later, Assistant Principal Uhlig suggested dates more than one week later to hold the ISMP meeting.

407.    Ultimately, an ISMP meeting was held on February 8, 2023.

408.    At this meeting, Assistant Principal Uhlig, Mr. Jones, Mr. Jones's parents, Mr. Jones's dean Brock Felchle, Mr. Jones's probation officer, and Ms. Hodge developed an ISMP.

409.    The meeting participants used a standard form ISMP from the probation department.

410.    During the meeting, the participants addressed each entry in the standard form ISMP from the probation department and decided whether to impose any restrictions on Mr. Jones.

411.    The ISMP placed minimal, if any, restrictions on Mr. Jones.

412.    The ISMP required that Mr. Jones arrive at school at 7 a.m. and depart no later than 3:30 p.m., with allowances for football and weightlifting during the summer.

413.    The ISMP also required Mr. Jones to leave school property when classes are completed unless previously arranged with Assistant Principal Uhlig or Dean Felchle.

414.    The ISMP stated that Mr. Jones was not permitted to be on district property other than his home school and only during school hours or with an approved safety plan.

415. The note accompanying this restriction read, in its entirety, "Track, Football, Basketball games. With allowances for summer football and weightlifting."

416. Mr. Jones was not and is not a basketball player for CCSD.

417. This exception was provided simply because Mr. Jones enjoys attending basketball games.

418. The ISMP provided that Mr. Jones would have access to Dean Felchle and the school psychologist to handle any potential conflicts that may emerge.

419. Finally, the ISMP required that Mr. Jones submit a safety plan to his treatment provider and probation officer to participate in extracurricular activities, with a copy to be kept on file at the school.

420. Despite this requirement, the school never received any safety plans on the part of Mr. Jones, nor did anyone at the school inquire as to why no safety plans had ever been submitted.

421. The ISMP did not include any restrictions on Mr. Jones having any unsupervised periods during his school day, despite this being one of the options presented on the standard form ISMP and despite this being the method by which Mr. Jones gained access to sexually assault Ms. Doe.

422. The ISMP did not include any restrictions on Mr. Jones's transport to or from school, despite these being options presented on the standard form ISMP.

423. The ISMP did not prohibit Mr. Jones from engaging in any verbally or physically threatening behaviors, despite this being one of the options presented on the standard form ISMP and despite his having been convicted of unlawful sexual contact after sexually assaulting Ms. Doe.

424.    The ISMP did not prohibit Mr. Jones from engaging in any sexual behavior, verbally or physically, including but not limited to telling jokes of a sexual nature, despite this being one of the options presented on the standard form ISMP and despite his having been convicted of unlawful sexual contact after sexually assaulting Ms. Doe.

425.    The ISMP did not require Mr. Jones to meet any and all conditions established in his bond and all conditions established by pre-trial release, probation, diversion, and human services, despite this being one of the options presented on the standard form ISMP.

426.    Mr. Jones's ISMP stated that it would be reviewed on or before August 31, 2023.

427.    Mr. Jones's ISMP has never been reviewed since its inception.

428.    At his deposition in August 2024 – just after the start of his senior year at CCHS – Mr. Jones testified that he did not know whether the ISMP was still in effect.

429.    Defendants did not make or keep a copy of the signed ISMP after finalizing it during the meeting.

430.    In May 2024, Dean Felchle emailed Mr. Jones's probation officer asking her whether she was "able to get a copy of [Mr. Jones's] ISMP we wrote up last year?"

431.    Dean Felchle continued by asking the probation officer to "email me a copy" if she were able to locate the ISMP.

432.    Defendants did not enforce the requirements of Mr. Jones's ISMP following the meeting.

433.    According to Mr. Jones, the ISMP never prevented him from doing anything he would have done otherwise as a student at CCHS.

434.    Mr. Jones finished his final season at CCHS as a star football player during his senior year.

435.    Mr. Jones was the defensive MVP for his football team last season.

436.    Within the past year, Mr. Jones has been ranked by major scouting websites between the second- and fifth-ranked recruit out of Colorado for the 2025 season.

**K.    CCSD Follows an Official Policy of Deliberate Indifference to Sexual Harassment and Assault**

437.    CCSD has faced numerous instances of sexual harassment and sexual abuse in the recent past that have been publicly revealed, and an unknown number of instances that have not been publicized.

438.    CCSD has consistently failed to respond adequately and with appropriate speed to these incidents.

439.    CCSD's failure to act has had a disparate impact on its female student population.

440.    In regards to high school students, female students constitute the vast majority of, if not entire class of, individuals reporting sexual assault at CCSD schools.

441.    In his 15 years as Principal of CCHS, Defendant Silva cannot recall a single instance where a male student had reported being sexually assaulted by another student. Defendant Silva can recall numerous instances of female students reporting sexual assault by another student.

442.    As part of their process for determining discipline, Defendants Silva and Uhlig regularly consult CCSD's legal department to ensure the discipline they administer is consistent across CCSD.

443.    In the past decade, CCSD has not regularly – if ever – expelled male students who have engaged in sexual assault.  Instead, CCSD has, at most, suspended male students for five days after determining that a male student sexually assaulted a female student.

444.    CCSD engages in this practice despite having adopted policies providing for expulsion when students commit sexual assault and despite expelling other students for far less egregious misconduct.

445.    In the 2021-2022 school year, CCSD expelled only *one* student for engaging in sexual harassment. 166 students were expelled for other reasons, including over 40 expulsions for the use of marijuana.

446.    Meanwhile, and as discussed further below, there were numerous reports of sexual assault and widespread protests over CCSD's lack of response to such reports during the same school year.

447.    CCSD's practice of rarely – if ever – expelling students who have committed sexual assault disproportionately impacts female high school students as victims of sexual assault.

448.    CCSD has also adopted a policy, practice, or custom of not investigating off-campus sexual harassment (including sexual assaults) pursuant to an overly conservative interpretation of the 2020 Title IX regulations.

449.    In particular, CCSD has trained its Title IX Coordinators as well as its staff not to investigate any sexual harassment that occurs off campus unless it occurs at a school-sponsored event like a field trip or athletics game, without considering the level of control the school had over the assailant or the context of the harassment.

450.    CCSD also trains its staff that sexual assaults occurring on or off campus should not be independently investigated by the school, and instead should be referred to law enforcement to conduct an exclusively criminal investigation.

451.    CCSD, meanwhile, regularly investigates non-sexual on- and off-campus behavior – including other criminal behavior – and imposes discipline for such.

452.    CCSD has adopted this policy, practice, or custom even though CCSD has authority – if not an obligation – to investigate most off-campus sexual misconduct under both Title IX and numerous CCSD policies outside of Title IX.

453.    CCSD's overly conservative interpretation of the 2020 Title IX regulations has resulted in far fewer reports of sexual harassment – including sexual assault – being investigated and responded to on the part of Defendants over the past five years.

454.    CCSD also does not train its employees on how to investigate and respond to allegations of sexual harassment outside of the Title IX process, despite having numerous policies that would require its administrators to take steps in response to such reports.

455.    More female students than male students report sexual harassment in CCSD schools each year. CCSD's failure to train its administrators on how to respond to reports of sexual harassment therefore disproportionately impacts female students.

456.    Over the past decade, CCSD has created, condoned, or ratified a toxic culture that includes a demonstrated pattern of ignoring reports of sexual harassment or assault, disbelieving or minimizing reports of sexual harassment or assault, and failing to take available steps to protect victims of sexual harassment or sexual assault from other students, including by failing to

investigate such reports and failing to appropriately discipline male students who have sexually assaulted female students.

457.    This toxic culture has resulted in a policy, custom, or practice of deliberate indifference among high-ranking administrators of ignoring or minimizing reports made by female students and allowing gender violence to flourish and fester.

458.    This policy of indifference is significantly heightened for accused male student athletes and existed before, during, and after the time that Ms. Doe was sexually assaulted by Mr. Jones.

459.    As one example of this indifference, on April 20, 2022, students at several CCSD schools staged a walkout to protest CCSD's taking too long to produce results from a Title IX investigation into an incident that occurred in November 2021 at Grandview High School.  The walkout related to a 16-year-old female student's report that a male student had touched her genitals without her permission, following a campaign of consistent sexual harassment and groping dating back to August 2020.  According to the victim, following the assault, the male student told her, "Your consent means nothing to me."

460.    Authorities charged the male student with misdemeanor unlawful sexual contact in January 2022, indicating that prosecutors believed that there was probable cause to convict.

461.    By the time of the walkout, five months after the underlying incident and three months after criminal charges were filed, CCSD had not yet completed its Title IX investigation.

462.    According to its training materials, a Title IX investigation should be completed within five days in most instances.

463.    Further, CCSD had not removed the male student from the school and provided him an alternative educational environment, temporarily or permanently, despite the ongoing criminal prosecution and its pending Title IX investigation, in violation of its school board policy JKD-1.

464.    Providing a student an alternative educational environment is not a punishment and thus is not prohibited as an interim measure under Title IX.

465.    As a result, the female victim continued to encounter her assaulter during the school day in the hallways and other school settings on an almost daily basis.

466.    Other instances of sexual harassment and sexual assault have been met with similar inaction.

467.    In November 2021, just two months before Doe's sexual assault, another female student at Cherokee Trail High School came forward with allegations that a male student had been sexually harassing her since August 2020, including repeatedly touching her and biting her thigh in class.  Strikingly, according to this victim, her assaulter *also* told her, "Your consent means nothing to me."    *See*   https://kdvr.com/news/problem-solvers/cherry-creek-schools-sex-misconduct-investigation-grandview/.

468.    CCSD presented a no-contact order to the Cherokee Trail students, which the assaulter violated with no consequences.  The female victim has stated, "The school has done nothing.  He's still in my class.  I got put in the corner and he gets to roam the room.  I feel like I'm getting the consequences of his actions."  *See id.*

469.    In the aftermath of the CCSD walkout, CCSD Superintendent Chris Smith sent an email to families on April 20, 2022, stating, "During advisory today, some students walked out of the building to raise awareness of sexual assault."

470.    Superintendent Smith's email suggested that the walkout was an attempt to raise awareness surrounding sexual assault generally, noting that "April is Sexual Assault Awareness and Prevention Month."  Superintendent Smith's email did not mention or acknowledge that the walkout was in response to CCSD's dilatory response to a specific sexual assault.

471.    Following widespread criticism in response to his email misrepresenting the purpose of the walkout, Superintendent Smith sent a follow-up email the next day.

472.    In his follow-up email, Superintendent Smith acknowledged that "some students" involved in the walkout were focused on a specific Title IX investigation.  Superintendent Smith declined to provide any information about the allegation or investigation, "as we have a legal obligation to protect their privacy and provide due process for all students involved."

473.    The same day, five more reports of sexual assault were made by families of students in five different high schools.  *See* https://kdvr.com/news/local/more-cherry-creek-families-report-sex-assault-cases/.  These families are part of a larger parent group that has been consistently raising concerns of sexual harassment to CCSD administrators, to no avail.

474.    These are just a few examples of a long history of CCSD's custom, policy, or practice of unlawful behavior.  *See also, e.g.*, Noelle Phillips, *Prairie Middle School Teacher Faces 31 Criminal Charges in Connection with Child Sexual Abuse*, DENVER POST, https://www.denverpost.com/2017/08/28/prairie-middle-school-teacher-criminal-charges-child-sexual-abuse/ (Aug. 28, 2017) (detailing charges against middle school teacher for sustained

sexual abuse of five students as well as Grandview High School employee who assaulted student in 2017); Abigail Miller, *Middle School Administrators Face Charges After "SUSPENDING 14-Year-Old Girl Who Said Her Teacher Sexually Assaulted Her and Pressuring Her to Drop Her Claims Because It Would Ruin His Career,"* DAILY MAIL, https://www.dailymail.co.uk/news/article-5266599/School-suspended-girl-saying-teacher-assaulted-her.html (Jan. 13, 2018) (Prairie Middle School principal and assistant principal encouraged 14-year-old victim to recant allegations of sexual assault against later-convicted middle school teacher due to deleterious effects it would have on teacher).

475.    Defendants further continue to look the other way with respect to allegations about Mr. Jones himself.

476.    In August 2024, Mr. Jones self-reported to Dean Felchle that another female student claimed that he had engaged in conduct with her similar to or nearly identical to his sexual assault of Ms. Doe.

477.    Despite Mr. Jones self-reporting these allegations, Defendants have not investigated whether Mr. Jones sexually assaulted this student.

478.    Despite Mr. Jones self-reporting these allegations, Defendants have not taken steps to identify or provide resources to the alleged victim.

479.    Despite Mr. Jones self-reporting these allegations, Defendants have not investigated whether Mr. Jones poses a danger to other female students of CCHS, nor have they conducted a threat assessment.

480.    Despite Mr. Jones self-reporting these allegations, Dean Felchle has not filed a written report to law enforcement despite his status as a mandatory reporter under Colorado law.

481.    Mr. Felchle's failure to do so is a violation of CCSD policy as well as state law. Mr. Felchle has admitted to violating this policy, yet CCSD has never disciplined him as a result.

482.    Instead, CCSD defended Mr. Fechle's failure to report and his violation of CCSD's written policy and state law.

483.    CCSD even went so far as to seek a court order to prevent the filing of a written report about Mr. Jones's conduct, in contravention of its own policies as well as the public policy of the State of Colorado.

484.    Neither Mr. Jones nor his parents have been contacted by Defendants, the CCHS athletics department, or law enforcement relating to these recent allegations.

485.    Mr. Jones continued to play football on the CCHS football team through the end of this past season, which is also his final season.

486.    Mr. Jones played the first game of the season for the CCHS football team on August 30, 2024, two weeks after self-reporting the sexual assault allegations.

487.    Mr. Jones completed the remainder of the football season at CCHS and was celebrated by CCSD during signing day as one of a handful of students selected to a Division I college football program.

488.    CCHS's football team once again won the state championship during the 2024-2025 school year.

489.    The toxic culture within CCSD, CCSD's custom, policy, or practice of deliberate indifference, and the complete failure of CCSD officials to address sexual misconduct on the part of male students, especially athletes, or to comply with their Title IX responsibilities created a heightened risk that sexual abuse would occur within CCSD's schools, which risk was known and

obvious to CCSD officials and repeatedly raised as a concern by students and community members.

490.    This hostile culture and policy of indifference, with the clear message that sexual harassment – including sexual assault – is a tolerable part of being in high school, has led to increased acceptance of sexual violence in CCSD and many, including Ms. Doe, have suffered as a result.

**L.      At All Pertinent Times, CCHS Acted in Conformity with CCSD Policies**

491.    According to Principal Silva, Defendant Uhlig "took all steps expected of him" with respect to the Doe/Jones matter, just as Dean Devitt "took all steps expected of her" in regards to the same.

492.    According to Principal Silva, he and his staff at CCHS – including Defendant Uhlig – "perform our duties within the policy" of CCSD.

493.    Defendant Silva trusted Defendant Uhlig at all times to do his job appropriately, including with respect to any delegation of Mr. Silva's authority as principal.

**IV. CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violation of Title IX (20 U.S.C. § 1681(a)) — Official Policy of Indifference**
**(Plaintiff Against Defendant CCSD)**

494.    Plaintiff incorporates by reference the foregoing paragraphs of this Third Amended Complaint as if set forth fully herein.

495.    CCSD officials, including CCHS administrators, actively created and maintained an official policy, custom, or practice of deliberate indifference to sexual harassment and assault by CCSD students by: (a) refusing to investigate off-campus sexual harassment at all or, in the

alternative, unless it took place at a school-sponsored activity like a field trip or athletics game; (b) refusing to investigate reports of sexual assault pending a criminal investigation; (c) refusing to create safety plans for victims of sexual assault, including refusing to impose no-contact directives (as opposed to agreements); (d) failing to conduct timely Title IX investigations; (e) refusing to conduct Title IX investigations at all where some portion of the conduct occurred off-campus notwithstanding the on-campus aspects and effects of such conduct; (f) failing to train administrators and staff on the enforcement of CCSD policies that provide for broader definitions of sexual harassment than Title IX and that include no jurisdictional limit; (g) fostering an environment of gender discrimination and hostility at school; (h) failing to reasonably respond to reports of bullying and harassment against victims of sexual harassment, among the other allegations included within the Complaint; and/or (i) requiring students to propose their own supportive measures, as opposed to offering such to them, as well as providing facially deficient supportive measures.

496. This policy, custom, or practice of indifference created a heightened risk of sexual harassment – including sexual assault and retaliation – within CCSD schools, and particularly among student athletes, that was known or obvious to administrators.

497. This policy, custom, or practice of indifference was a proximate cause of Ms. Doe's being subjected to ongoing sexual harassment in the form of: (a) a hostile education environment; (b) ongoing harassment (including retaliatory bullying) perpetrated by Mr. Jones and his classmates; and (c) vulnerability to future harassment by being forced to see or interact with Mr. Jones and/or his friends and teammates in daily life at CCHS.

498.    This policy, custom, or practice was also a proximate cause of Ms. Doe's being subjected to sexual assault by Mr. Jones during the course of the school day while subject to Defendants' substantial control.

499.    The sexual assault and harassment that Ms. Doe suffered was sufficiently severe, pervasive, or objectively offensive that it deprived her of access to the educational opportunities or benefits provided by CCSD.

500.    Similarly, the failure of CCSD to offer students sufficient supportive measures resulted in a deprivation of Ms. Doe's access to the educational opportunities or benefits provided by CCSD.

501.    As a direct and proximate result of CCSD's official policy, custom, or practice of deliberate indifference, Ms. Doe suffered damages and injuries for which CCSD is liable.

**SECOND CLAIM FOR RELIEF**
**Violation of Title IX (20 U.S.C. § 1681(a)) — Deliberate Indifference to Ms. Doe's Report of Sexual Assault**
**(Plaintiff Against Defendant CCSD)**

502.    Plaintiff incorporates by reference the foregoing paragraphs of this Third Amended Complaint as if set forth fully herein.

503.    Beginning in January 2022 and by no later than March 2022, CCSD had actual knowledge that Ms. Doe was a victim of sexual assault and attempted penile/vaginal rape by Mr. Jones, and that she was experiencing an ongoing hostile educational environment due to Mr. Jones's ongoing presence at CCHS, harassment from Mr. Jones and his friends and teammates, retaliation by other students for reporting the sexual assault to the school and to police, and a complete lack of safety plan, no-contact directive, or other mechanisms to ensure her well-being.

504.    CCSD was also on notice of the significant impact that this hostile educational environment was having on Ms. Doe's education at CCHS given Mses. Doe's and Roe's ongoing reports to school administrators, Ms. Doe's excessive absences from classes, and Ms. Doe's eventual withdrawal from CCHS.

505.    CCSD acted with deliberate indifference to this notice when it failed to conduct a Title IX investigation into the hostile educational environment or Ms. Doe's vulnerability to further harassment or to take other remedial measures – including offering adequate supportive measures and making efforts to end the harassment – to address the hostile educational environment and to prevent further harassment.  CCSD's failure to take adequate, or any, action was clearly unreasonable in light of known circumstances.

506.    The hostile environment and harassment Ms. Doe experienced were sufficiently severe, pervasive, or objectively offensive that they deprived her of access to the educational opportunities or benefits provided by CCSD and ultimately led her to withdraw from CCHS prior to the 2022-2023 school year.

507.    As a direct and proximate result of CCSD's deliberate indifference, Ms. Doe suffered damages and injuries for which CCSD is liable.

**THIRD CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 — Equal Protection**
**(Plaintiff Against Defendant CCSD)**

508.    Plaintiff incorporates by reference the foregoing paragraphs of this Third Amended Complaint as if set forth fully herein.

509.    The discriminatory conduct directed toward Ms. Doe was representative of an official policy, custom, or usage of CCSD and/or was undertaken by an official or officials with

final policymaking authority. Alternatively, CCSD failed to train its employees regarding how to respond to reports of sexual harassment and assault that do not fall under Title IX's definition of "sexual harassment."

510.    Principal Silva had final policymaking authority with respect to CCHS's response to reports of student-on-student sexual assaults and sex-based student-on-student harassment and bullying. Principal Silva delegated this authority in fact to Defendant Uhlig who, in turn, had final policymaking authority with respect to the same. Defendant Uhlig was further designated as CCHS's Title IX Coordinator, which vested in him the authority and responsibility to apply and oversee CCHS's implementation of Title IX on behalf of CCSD.

511.    Defendants Silva's and Uhlig's deliberate indifference toward female students and parents reporting sexual harassment and assault, and their repeated resolve not to open a Title IX investigation or to otherwise take actions to protect victims of sexual harassment or assault because part of the conduct occurred off school grounds, resulted in violation of the equal protection rights of the female students who reported off-campus sexual harassment or assault, including Ms. Doe.

512.    Further, in their exercise of their delegated authority, Defendants Silva and Uhlig consulted CCSD's legal department with respect to every report of off-campus sexual harassment or assault and followed CCSD's legal department's recommendations. CCSD's legal department never recommended that Defendants Silva and Uhlig investigate or take actions to protect victims of off-campus sexual harassment or assault, demonstrating CCSD's official policy, custom, or usage of ignoring such reports.

513.     At the same time, Defendants Silva and Uhlig, and CCSD generally, have regularly investigated and taken responsive action as to off-campus conduct other than sexual harassment or assault, including drug use, shoplifting, social media posts, and fights.

514.     By systematically ignoring reports of off-campus sexual harassment and assault, which have been raised exclusively by female students, and taking action as to other off-campus conduct, Defendants have violated the equal protection rights of the female students who report off-campus sexual harassment or assault, including Ms. Doe.

515.     Alternatively, CCSD maintained a policy or custom of failing to train its employees adequately regarding how to respond to reports of off-campus sexual harassment or assault. Despite the fact that Title IX defines "sexual harassment" more narrowly than state laws and CCSD's policies and procedures, Defendants provided no training to its employees regarding how to respond to reports of sexual harassment or assault that did not fall under Title IX.

516.     Ms. Doe's injuries were caused by this policy or custom, as CCSD's employees failed to take adequate actions as to her reports due to their belief (consistent with their training) that CCSD could take no action as to reported sexual harassment or assault that did not fall under Title IX. These injuries were obvious and closely related to the failure to train.

517.     CCSD, in implementing its policy or custom of deficient training, knew with certainty that their employees would receive reports of off-campus sexual harassment and assault, but failed to provide any training regarding appropriate responses to non-Title IX sexual harassment despite the fact that such training would aid its employees in responding to these situations and despite the fact that failing to respond appropriately to these incidents would frequently result in the deprivation of reporting students' constitutional rights.

518.     As a result of CCSD's indifference and its violations of 42 U.S.C. § 1983, Ms.

Doe was subjected to differential treatment on the basis of sex and suffered significant damages,

both economic and non-economic, as set forth above.

**FOURTH CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 — Equal Protection**
**(Plaintiff Against Defendants Silva and Uhlig)**

519.     Plaintiff incorporates by reference the foregoing paragraphs of this Third Amended

Complaint as if set forth fully herein.

520.     At all times pertinent to this action, Principal Silva and Assistant Principal Uhlig

were acting under the color of state law and their acts and omissions were conducted within the

scope of their official duties or employment.

521.     Based upon information they received, Principal Silva and Assistant Principal

Uhlig had actual knowledge of Mr. Jones's sexual assault on Ms. Doe and the ongoing hostile

educational environment that Ms. Doe was experiencing as a result of her assault.

522.     Nonetheless, Defendants Silva and Uhlig acquiesced in and were deliberately

indifferent to Mr. Jones's sexual misconduct and the ongoing hostile educational environment Ms.

Doe experienced by refusing to respond reasonably to it, failing to investigate and redress whether

Ms. Doe was experiencing a hostile educational environment or whether she was vulnerable to

further harassment, failing to investigate and redress additional harassment that Ms. Doe was

experiencing, failing to investigate whether Mr. Jones posed a substantial risk of harm to Ms. Doe

or other female students, and failing to discipline Mr. Jones or take other remedial measures with

respect to his conduct.

523.    The law was clearly established at the time of Defendants Silva's and Uhlig's actions and failures to act such that a reasonable official in their position would have understood that their conduct implicated Ms. Doe's constitutional rights. *See, e.g.*, *Murrell v. Sch. Dist. No. 1, Denver*, 186 F.3d 1238, 1251 (10th Cir. 1999); *Doe v. Roaring Fork Sch. Dist.*, 2020 WL 7711322, at *4-6 (D. Colo. Dec. 29, 2020).

524.    As a result of Defendants' Silva's and Uhlig's indifference and their violations of 42 U.S.C. § 1983, Ms. Doe was subjected to differential treatment on the basis of sex and suffered significant damages, both economic and non-economic, as set forth above.

525.    The acts or omissions of Defendants Silva and Uhlig as described herein were taken maliciously, willfully, or with a reckless or wanton disregard of Ms. Doe's constitutional rights, and Plaintiff is entitled to punitive damages against these Defendants in addition to compensatory, economic, consequential, and special damages.

## FIFTH CLAIM FOR RELIEF
### Negligence — Claire Davis School Safety Act
### (Plaintiff Against All Defendants)

526.    Plaintiff incorporates by reference the foregoing paragraphs of this Third Amended Complaint as if set forth fully herein.

527.    At all times pertinent to this action, Principal Silva and Assistant Principal Uhlig were employees of CCSD acting within the scope of their official duties or employment.

528.    Mr. Jones committed or attempted to commit a felony sexual assault against Ms. Doe as defined in C.R.S. § 18-3-402.

529.    Specifically, Mr. Jones both caused and attempted to cause Ms. Doe to submit to sexual intrusion or sexual penetration against her will through the actual application of physical force or physical violence.

530.    Further, Ms. Doe suffered serious bodily injury as a result of Mr. Jones's sexual assault, both in the form of forceful vaginal penetration, bruises, scratches, and abrasions, physical injuries, and through the development of post-traumatic stress disorder symptomatology.

531.    Such conduct by Mr. Jones constituted an "incident of school violence" pursuant to C.R.S. § 24-10-106.3(2)(c).

532.    CCSD had a duty to exercise reasonable care to protect Ms. Doe from harm from acts committed by other individuals, like Mr. Jones, when that harm is reasonably foreseeable, while Ms. Doe was participating in school-sponsored activities.

533.    When Mr. Jones sexually assaulted Ms. Doe through digital penetration against her will, and when he attempted to engage in penile/vaginal rape on Ms. Doe, both students were participating in school-sponsored activities.

534.    By traveling off-campus during school-sanctioned "off" periods during the school day, Mr. Jones and Ms. Doe were both subject to CCSD's supervision and control as the school's provision for and approval of students exiting campus during such periods rendered such activities as a school-sponsored activity.

535.    CCSD's repeated communications asserting control over the off-campus behavior of students during such "off" periods confirmed the school's authority, control, and sponsorship of such activities.

536.    Defendants breached their duty to exercise reasonable care to protect Ms. Doe from reasonably foreseeable harm arising from an incident of school violence.

537.    Specifically, Defendants failed to exercise control over students during their "off" periods sufficient to forestall such reasonably foreseeable incidents of felony sexual assault while students were off-campus and thus outside the direct supervision of CCSD faculty members.

538.    Further, Defendants failed to prevent Ms. Doe from suffering harm from reasonably foreseeable acts by other students, such as bullying, physical abuse, and harassment, arising from an incident of school violence such as Mr. Jones's sexual assault and attempted penile/vaginal rape of Ms. Doe.

539.    Defendants' breach of their duty of care caused Ms. Doe's injuries as a result of Mr. Jones's sexual assault and attempted penile/vaginal rape of Ms. Doe, as well as Ms. Doe's injuries resulting from bullying, physical abuse, and harassment by other students.

540.    Ms. Doe has suffered significant damages, both economic and non-economic, as a result of these violations of C.R.S. §24-10-106.3, as set forth above.

541.    The acts or omissions of Defendants Silva and Uhlig as described herein were taken willfully or wantonly.

542.    As a direct and proximate result of Defendants' negligence, Ms. Doe suffered damages and injuries for which Defendants are liable.

543.    Plaintiff brings this good faith and non-frivolous claim for the express purpose of extending, limiting, modifying, or reversing existing precedent, law, or regulation; or for the express purpose of establishing the meaning, lawfulness, or constitutionality of a law, regulation

or United States or state constitutional right and the meaning, lawfulness, or constitutionality has

not been determined by the Colorado Supreme Court.

544.     Specifically, Plaintiff brings this claim in good faith for the express purpose of

extending or modifying precedent and for establishing the meaning, application, and lawfulness of

C.R.S. § 24-10-106.3 in light of the relative recency of the statute's passage and the dearth of

precedential case law existing with respect to its interpretation or bounds of effect.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment in her favor and

against each of the Defendants, and to award her all relief as allowed by law and equity, including,

but not limited to, the following:

a)     All appropriate relief at law and equity;

b)     Actual economic damages as established at trial;

c)     All available compensatory, non-economic, consequential, and other damages,
       including, but not limited to, emotional distress, suffering, humiliation,
       inconvenience, mental anguish, loss of enjoyment of life, lost educational
       opportunities, physical injury, and other pain and suffering on all claims allowed
       by law in an amount to be determined at trial;

d)     Nominal damages for all claims allowed by law;

e)     Punitive damages for all claims allowed by law in amount to be determined at trial;

f)     Pre-judgment and post-judgment interest at the highest lawful rate;

g)     Attorneys' fees and the costs associated with this action as allowed by law,
       including expert-witness fees; and

h)    Any further relief that this Court deems just and proper, and any other relief as

allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 12th day of March 2025.

Respectfully submitted,

*s/ Stephen Shaw*
Laura B. Wolf
Stephen Shaw
Spark Justice Law LLC
3435 S. Inca Street, Suite C-113
Englewood, CO 80110
(303) 802-5390 (t) / (303) 848-3003 (f)
laura@spark-law.com
steve@spark-law.com

Aurora L. Randolph
ALR Civil Rights LLC
9878 W. Belleview Ave., Suite 2129
Denver, CO 80123
(303) 968-1703 (t)
aurora@alrcivilrights.com

*Attorneys for Plaintiff*