**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-00687-NYW-TPO

**JANE DOE**,

      Plaintiff,

v.

**CHERRY CREEK SCHOOL DISTRICT**;
**KEVIN UHLIG**, in his individual capacity;
and **RYAN SILVA**, in his individual capacity,

      Defendants.

——————————————————————————————————————

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

——————————————————————————————————————

Plaintiff Jane Doe, by and through undersigned counsel, respectfully submits this Motion for Partial Summary Judgment and in support thereof states as follows:

### INTRODUCTION

This case stems from the sexual assault Ms. Doe, then fifteen-years old, suffered at the hands of Mr. Jones, a classmate, during the school day.  This case addresses what followed: the utter disinterest and inaction with which she was met when she reported the assault to her school and the impact that had on her education and life.  Title IX and the Equal Protection Clause mandate that CCSD and its officials must respond to such reports in a reasonable manner.  In Ms. Doe's case, they did not.

Defendants have endeavored to inflate how much they did for Ms. Doe, as well as the obstacles to doing more.  But the undisputed evidence in this case reflects that Defendants merely offered a few inadequate supportive measures upon receiving Ms. Doe's report, then never revisited them despite ample evidence that Ms. Doe was still struggling to access her education.  And when they learned that Ms. Doe was experiencing persistent bullying and harassment, Defendants ignored the report entirely. This limited response was not enough to satisfy Defendants' responsibility to ensure Ms. Doe had equal access to her educational opportunities regardless of her sex.

For these and the following reasons, there is no genuine dispute of material fact as to Ms. Doe's entitlement under the law to summary judgment on her Second, Third, and Fourth Claims for Relief from her Second Amended Complaint [ECF 100].

### MOVANT'S STATEMENT OF MATERIAL FACTS

1.    Defendant Cherry Creek School District ("CCSD") is a public school district in Colorado.  As a recipient of federal funding, CCSD is subject to Title IX of the Educational

Amendments of 1972, 20 U.S.C. § 1681(a).  Cherry Creek High School ("CCHS") is one of the K-12 institutions that comprise CCSD.  Second Amended Answer ("SAC Answer") [ECF No. 114] ¶ 7.

2.      At all times pertinent to this matter, Defendant Ryan Silva was the Principal of CCHS and Defendant Kevin Uhlig was an Assistant Principal of CCHS.  *Id.*

3.      In January 2022, both Plaintiff Jane Doe and her assaulter John Jones were freshmen at CCHS.  At that time, Ms. Doe was fifteen years old.  *Id.* ¶ 8; **Ex. 1**, *Jones Dep.* at 94:8-10; **Ex. 2**, *2022.01.25 GVPD Offense Report* at 1.

4.      Mr. Jones and Ms. Doe were both student athletes; Mr. Jones participated in football and track and Ms. Doe played soccer.  *See* **Ex. 3**, *Relevant Emails* at 5; *id.* at 22.

5.      On January 19, 2022, during an off period during the school day, Mr. Jones and Ms. Doe went to a Starbucks several blocks from CCHS's campus.  While there, Mr. Jones sexually assaulted Ms. Doe in the bathroom.  **Ex. 2** at 2.

6.      Mr. Jones later pled guilty to Unlawful Sexual Contact, No Consent.  **Ex. 4**, *Plea Agreement* at 1; C.R.S. § 18-3-404(1)(a).

7.      In the course of his sexual assault, Mr. Jones penetrated Ms. Doe's vagina with his finger and tried to insert his penis into her vagina while he held her down, before she escaped.  **Ex. 2** at 2.

8.      Defendants' Title IX training provides that any penetration without consent qualifies as rape for purposes of the Clery Act and thus as sexual harassment under Title IX.  **Ex. 5**, *2020-2021 Title IX Training: New Regulations Training II* at 12.

3

**Early Supportive Measures**

9.    On January 25, 2022, Ms. Doe and her mother, Jane Roe, reported the sexual assault to the School Resource Officer ("SRO") at CCHS.  Ms. Doe described the sexual assault and identified Mr. Jones as the perpetrator.  The officer brought Ms. Doe's dean, Kelly Devitt, to speak with Ms. Doe about the assault and what steps could be taken in response to it.  SAC Answer [ECF No. 114] ¶ 11; **Ex. 2** at 2.

10.    No one from CCSD informed Ms. Doe or Ms. Roe of Title IX or their Title IX rights, and no one filed a Title IX report on behalf of Ms. Doe.  **Ex. 6**, *30(b)6) Dep. (Devitt)* at 76:7-17; **Ex. 7**, *Doe Dep.* at 111:18-113:12; **Ex. 8**, *Roe Dep.* at 96:1-14.

11.    Ms. Doe told Dean Devitt about the sexual assault.  Either at that time or shortly thereafter, Ms. Doe also told Dean Devitt that Mr. Jones was the perpetrator.  **Ex. 9**, *Student Narrative* at 2.

12.    Dean Devitt offered that Ms. Doe could take breaks in Dean Devitt's office whenever needed during the school day, including during class periods.  **Ex. 10**, *Devitt Dep.* at 82:7-12, 144:6-7; **Ex. 11**, *Defs.' Resp. to Second Set of Discovery Requests* at Interrogatory Resp No. 13.

13.    On or before February 7, 2022, Ms. Doe went to Dean Devitt's office for a break, and Devitt offered Ms. Doe a no-contact agreement with Mr. Jones.  **Ex. 9** at 2.

14.    A CCHS no-contact agreement prohibits interaction between students, including at school and over social media.  Unlike a civil or criminal protection order, it is enforced by the school rather than police and violation can result in school-imposed discipline.  **Ex. 12**, *Defs.' Resp. to Sixth Set of Discovery Requests* at Interrogatory Resp. No. 32; **Ex. 6** at 59:15-22, 95:4-7.

15.    As part of a no-contact agreement, CCHS deans could implement a movement plan which could prescribe specific paths or timing for students in order to prevent contact during unstructured time like passing periods.  **Ex. 13**, *Felchle Dep.* at 74:11-76:8; *see also, e.g.*, **Ex. 14**, *Student Narrative* at 2 (where different student reported off-campus sexual assault, Dean Devitt prescribed specific timing for involved students' movements on May 5, 2022).

16.    Dean Devitt did not fully explain to Ms. Doe what a no-contact agreement was, including failing to explain the difference between the enforcement of a no-contact agreement and a protection order.  **Ex. 7** at 50:14-51:20.

17.    In particular, while Defendants enforce no-contact agreements at school, Defendants do not enforce protection orders or investigate protection order violations.  **Ex. 10** at 149:23-150:1; **Ex. 6** at 59:15-22.

18.    Ms. Doe declined the no-contact agreement at that time because Mr. Jones had not yet learned that she had reported the assault to the police, and she did not want him to learn about her report through the school.  She also knew that her mother was seeking a protective order in court, though she did not understand the difference between a protective order and a no-contact agreement.  **Ex. 10** at 88:13-90:8; **Ex. 7** at 50:16-51:20.

19.    Defendants never offered a no-contact agreement to Ms. Doe again during the 2021-22 school year, even after Mr. Jones's criminal case was underway.  **Ex. 6** at 113:24-114:5**,** 116:5-9.

20.    Defendants never explained to Ms. Doe or Ms. Roe the differences between no-contact agreements and protection orders, including differences in their enforcement at school.  **Ex. 15**, *2022.08.19 Hazen-McKenzie Letter* at 2.

21.    CCHS has the authority to impose a no-contact agreement to protect students even if the students involved do not voluntarily agree to its terms.  **Ex. 10** at 190:12-20.

22.    Defendants never created a movement plan to prevent Ms. Doe and Mr. Jones from encountering each other at school.  *See generally* **Ex. 9**.

23.    On or around February 28, 2022, Ms. Roe submitted a civil protection order to CCSD prohibiting contact between Mr. Jones and Ms. Doe.  *Id.* at 2.  Ms. Roe submitted a criminal protection order on May 13, 2022 to CCSD.  **Ex. 3** at 75-77.

24.    Throughout the semester, Ms. Doe took numerous breaks in Dean Devitt's office, including during her classes.  Over certain periods of time, she went to Dean Devitt's office daily.  *Id.* at 10-12; *id.* at 48.

25.    Dean Devitt would not always be available when Ms. Doe went to her office. During these times, Ms. Doe would merely sit in the office's waiting area until she decided to leave.    **Ex. 10** at 143:25-144:10, 145:9-21; **Ex. 7** at 71:17-72:3, 93:9-23, 130:17-131:16, 138:6-139:3, 149:12-18.

26.    On April 12, 2022, Dean Devitt arranged for Ms. Doe and Mr. Jones not to be scheduled in the same classes the next school year "due to a protection order in place." **Ex. 3** at 9.

### Ms. Doe Continues to Struggle

27.    On March 2, 2022, Ms. Doe's school counselor emailed Ms. Doe and her parents to share that Ms. Doe was struggling in several classes and to suggest that she speak to her teachers and seek out tutoring.  *Id.* at 41-42.

28.    Ms. Roe emailed Defendant Uhlig on March 11, 2022 asking for more supportive measures for Ms. Doe.  She noted that Ms. Doe spent part of many days in Dean Devitt's

office rather than class, that she was failing two classes, and that she suffered a variety of physical and emotional harms attending school with Mr. Jones. *Id.* at 24.

29.    Throughout the semester, Ms. Roe repeatedly informed CCHS administrators of Ms. Doe's struggles in accessing her education due to the assault and having to see Mr. Jones at school. *See, e.g.*, *id.* at 22; *id*. at 31; *id.* at 11; **Ex. 16**, *Transcript of 2022.05.13 Meeting* at 3:7-18, 12:6-11, 14:5-15.

30.    Following the assault, Ms. Doe feared encountering Mr. Jones when she was at school. **Ex. 17**, *Pl.'s Resp. to Fourth Set of Discovery Requests* at Interrogatory Resp. No. 42; **Ex. 7** at 249:24-250:8.

31.    After Ms. Doe reported Mr. Jones's sexual assault, other students also became aware of what had happened. **Ex. 7** at 51:4-9.

32.    Many students bullied and harassed Ms. Doe in response to her reporting Mr. Jones. Female students would tell her that it was normal to experience sexual assaults at CCHS and she should not be upset. Other students would tell her she was lying about what had happened or accused her of ruining Mr. Jones's football prospects. *See, e.g.*, *id.* at 59:4-19, 98:2-11, 126:19-127:13, 191:8-11.

33.    Mr. Jones's friends and his teammates would publicly accuse Ms. Doe of lying in the halls between classes. They would also throw paper at her during class with derogatory messages and tell her she should drop out. *Id.* at 81:15-82:7, 255:14-21.

34.    On one occasion immediately outside a Dean's office, approximately six or seven football players trapped Ms. Doe in a circle around her, asking her intrusive questions about Mr. Jones and her report of the sexual assault and calling her rude names while physically refusing to let her leave. *Id.* at 116:15-122:10.

35.    In response to this treatment, Ms. Doe changed her daily activities at school.  In particular, Ms. Doe changed the routes she used to walk between classes daily so that football players and other students would not know where to find her.  *Id.* at 66:21-67:15, 125:12-18, 140:7-15, 181:16-19.

36.    Ms. Doe also spent periods of time hiding in bathrooms, including in the morning before school, during lunch periods, and in between classes, to avoid harassing conduct from other students.  *Id.* at 132:17-133:3, 140:10-141:21, 143:19-144:3, 250:2-17.

37.    Ms. Doe repeatedly left school early due to her physical symptoms, including migraines, vomiting, and fainting.  *See, e.g.*, **Ex. 18**, *2022.01.20 Doe-Roe Text Messages* at 1; **Ex. 19**, *2022.02.15 Doe-Roe Text Messages* at 1; **Ex. 20**, *2022.04.01 Doe-Roe Text Messages* at 1.

### Defendants Take No Further Action to Support Ms. Doe

38.    On March 10, 2022, and after learning about Title IX on her own, Ms. Roe filed a Title IX complaint with Defendant Uhlig's office.  **Ex. 21**, *2022.03.10 Title IX Complaint*.

39.    The very next day, Defendant Uhlig dismissed the Title IX complaint because the assault had taken place off campus.  **Ex. 3** at 25; **Ex. 22**, *2022.03.11 Title IX Dismissal*.

40.    Ms. Roe filed a second Title IX complaint in June 2022 at Defendant Uhlig's suggestion, including specific allegations that Mr. Jones had lured Ms. Doe off campus by taking her cell phone while at school so that she would have to follow him to retrieve it. **Ex. 23**, *2022.06.29 Title IX Complaint*; **Ex. 3** at 13.

41.    Defendant Uhlig also denied this second Title IX complaint **one day** after it was filed.  **Ex. 24**, *2022.06.30 Title IX Dismissal*; **Ex. 3** at 82.

42.    Defendants never performed any investigation of the sexual assault, under Title IX or otherwise.  **Ex. 25**, *Defs.' First Supp. Resp. to First Set of RFAs*, Supp. Resp. Nos. 8-9.

43.    Defendants took the position that they could not investigate Mr. Jones under Title IX because the assault occurred off campus and thus did not fall under Title IX.  *Id.* at Resp. No. 8; **Ex. 22**.

44.    Meanwhile, Defendants also took the position that they could not discipline Mr. Jones prior to an adjudication of his guilt because of Mr. Jones's rights under Title IX.  **Ex. 3** at 29; **Ex. 16** at 44:5-11; **Ex. 26**, *Silva Dep.* at 76:12-21.

45.    On May 6, 2022, Defendant Silva emailed Ms. Roe that CCHS had "investigated this matter fully" and "taken appropriate action for a situation like this."  **Ex. 3** at 31.

46.    This statement was untrue, as Defendants had never investigated the matter.  **Ex. 25**, *Defs.' First Supp. Resp. to First Set of RFAs*, Supp. Resp. Nos. 8-9.

47.    Around this time, Ms. Doe reported two violations of the protective orders to the school's SRO.  These incidents occurred in CCHS's athletic training room and involved Mr. Jones's staring at her, passing closer to her than permitted by the protective orders, and putting his crotch in front of her face.  **Ex. 27**, *2022.05.10 GVPD Supplemental Report* at 3-4; **Ex. 28**, *2022.05.12 GVPD Offense Report* at 2.

48.    The SRO investigated and took the potential violations to the district attorney, who declined to prosecute the incidents.  **Ex. 27** at 4; **Ex. 28** at 3.

49.    Defendants did not take **any** action in response to these incidents, later claiming it was because Ms. Doe reported them to the school's SRO rather than to Dean Devitt.  **Ex.**

**3** at 35; **Ex. 10** at 137:17-138:14.   School officials, meanwhile, were aware of the violations in real time.  **Ex. 3** at 43.

50.    On May 13, 2022, Ms. Roe met with Defendant Silva to discuss her concerns that Ms. Doe was not receiving adequate supports and that Defendant Uhlig was not taking adequate steps to protect Ms. Doe.  During this meeting, Ms. Roe informed Defendant Silva that Mr. Jones had told other students about Ms. Doe's report of sexual assault and "so now she has other football players that, you know, give her the stink eye and say offhanded remarks and, you know, whatever they do."  **Ex. 16** at 61:10-13.

51.    Defendant Silva understood Ms. Roe's statement to be a report of bullying and harassment from other students in response to Ms. Doe's report of sexual assault.  **Ex. 26** at 178:20-179:5; **Ex. 29**, *30(b)(6) Dep. (Silva)* at 156:18-23.

52.    Defendant Silva testified that he was required to take action in response to this report and that he would have informed Defendant Uhlig of the bullying and harassment with an expectation that Defendant Uhlig and Dean Devitt would address the conduct and take remedial action.  **Ex. 26** at 179:21-182:18.

53.    Defendant Silva referenced having multiple conversations with Defendant Uhlig regarding this matter.  *Id.* at 181:6-12.

54.    CCSD testified that, in response to Ms. Roe's report, "it would be incumbent at that time for the school district to take proactive measures to learn more about that harassment and to remedy that harassment."  **Ex. 29** at 156:18-157:3.

55.    Defendants never took any action in response to learning that Ms. Doe was experiencing harassment from other students.  Defendants never even documented receiving this report of harassment in Ms. Doe's student file.  *See generally* **Ex. 9.**

56. In fact, Defendants denied ever having been informed of the harassment at all until well into this litigation. *See, e.g.*, **Ex. 12**, *Defs.' Resp. to Sixth Set of Discovery Requests* at Interrogatory Resp. No. 31 (dated September 16, 2025).

57. CCSD testified that any offer of supportive measures to a student would be reflected in that student's file as part of the student narrative, whether or not the offered supportive measure was accepted. **Ex. 29** at 135:1-136:10.

58. CCSD testified that mental health services would be a core supportive measure provided to victims of sexual assault. *Id.* at 125:11-126:2.

59. Ms. Doe's student narrative does not reflect that she was offered any mental health services by Defendants. *See generally* **Ex. 9**.

60. CCSD testified that, "If CCSD were aware that a sexual assault survivor were regularly missing class due to the impacts of the sexual assault, it would be clearly unreasonable not to address the situation by finding supportive measures to improve their access to the classroom[.]" **Ex. 29** at 144:23-145:4.

61. CCSD took no steps to provide supportive measures to improve Ms. Doe's access to the classroom. Indeed, CCSD has claimed that its supportive measure was allowing Ms. Doe to miss class. *See* **Ex. 11** at Interrogatory Resp No. 13.

62. CCSD testified that in response to a reported sexual assault, "It would be clearly unreasonable to have done anything less than . . . putting in a no-contact agreement and ensuring that the students had full access to their deans for check-ins" and that doing so would be "in line with what we would do with any other student in . . . this similar situation." **Ex. 30**, *30(b)(6) Dep. (Uhlig)* at 188:17-189:2.

63. CCSD never put a no-contact agreement in place for Ms. Doe. **Ex. 6** at 94:4-8.

64.    Ms. Doe withdrew from CCSD prior to beginning the next school year.  **Ex. 31**, *Defs.' Resp. to First Set of Discovery Requests* at Interrogatory Resp. No. 1.

65.    In October 2022, after Mr. Jones pled guilty, Defendants suspended Mr. Jones for four days "for pleading guilty to sexaul [*sic*] contact/no consent."  **Ex. 32**, *Suspension Letter*.

66.    The letter communicating the suspension specifically noted that Mr. Jones was being disciplined for violating two CCSD policies, JICDA and JKD-1-E, through "[b]ehavior on or off school property that is detrimental to the welfare, safety, or morals" of other students or school personnel.  *Id.*

### Defendants' Policies

67.    During the relevant time period, CCHS granted students "off-campus privileges" to leave the school's campus without supervision during the school day.  **Ex. 33**, *2021-22 Bear Facts Handbook* at 35.

68.    Off-campus privileges were purely discretionary on the part of the school, and they could be withdrawn at any time for misbehavior, on or off campus.  *Id.*; **Ex. 34**, *Defs.' Supp. Resp. to Plaintiff's Written Discovery Requests* at Interrogatory Resp. No. 15.

69.    CCSD issued its school policies to CCHS students and parents in the form of the Bear Facts Handbook, which was updated each year.  The handbook included school board policies as well as policies specific to the operation of CCHS.  *See generally* **Ex. 33**; **Ex. 35**, *Defs.' Resp. to Third Set of Discovery Requests* at RFA Resp. No. 13.

70.    The policies set forth in the Bear Facts Handbook require students to behave appropriately on or off campus and permit Defendants to discipline students for misbehavior off campus.  **Ex. 33** at 23.

71.    Defendants regularly disciplined students for off-campus misbehavior, including shoplifting, fighting, drug use, and even generalized disruptive behavior.  **Ex. 3** at 84; **Ex. 36**, *Uhlig Dep.* at 189:16-21, 206:6-10, 216:14-24, 217:15-25; *see also, e.g.*, **Ex. 37**, *2019-2023 Suspension Records* at 2 (suspension for "attempting to steal from the West Café"), 15 (suspension for two students who "got into a fight at the King Soopers").

72.    Defendant Silva and CCSD Superintendent Chris Smith repeatedly emailed the CCSD community affirming their ability and intention to discipline off-campus misbehavior.  **Ex. 3** at 84-85; *id.* at 54-55; *id.* at 86.

73.    Just two months before the sexual assault, Defendants Silva and Uhlig took steps to identify and discipline students who were misbehaving off-campus, including by reaching out to local businesses.  **Ex. 30** at 91:8-104:17; *see also, e.g.*, **Ex. 3** at 54-55; *id.* at 57; *id.* at 52-53; *id.* at 47; *id.* at 60-62; *id.* at 63.

74.    Additionally, students who participated in extracurricular activities, including sports, were required to submit to a Participation Agreement that further reaffirmed Defendants' control over and authority to discipline students for inappropriate off-campus conduct regardless of the date, time, or location.  **Ex. 3** at 2-3; **Ex. 30** at 109:1-17.

**Defendants Silva and Uhlig Were Final Policymaking Authorities**

75.    The Bear Facts Handbook and CCSD policies contained therein designated Defendant Silva as the individual responsible for receiving and initially acting upon student allegations of sexual harassment, as well as disciplining students including imposing suspensions of up to ten days.  **Ex. 33** at 19, 23, 33-34.

76.    They also provided him with sole discretion to determine whether a student "is representative of the school's ideals in matters of citizenship, conduct and sportsmanship"

for purposes of determining whether a student is eligible to represent the school in activities, including CCHS's football team. *Id.* at 59, 62.

77.     Further, "[t]he determination to impose sanctions related to participation in interscholastic athletics and the nature of the sanctions to be imposed shall be made by the principal or his or her designee." *Id.* at 62.

78.     Defendant Uhlig was Defendant Silva's designee with respect to all student disciplinary matters in his role as the Assistant Principal responsible for discipline and as CCHS's Title IX Coordinator.  **Ex. 26** at 26:19-27:3; **Ex. 36** at 73:10-19; **Ex. 29** at 37:13-38:2.

79.     As the Title IX Coordinator, Defendant Uhlig was "identified as the designated employee to coordinate compliance activities at the building level" with respect to Title IX, including conducting investigations and dismissing Title IX complaints.  **Ex. 33** at 31.

80.     Defendants' policies did not meaningfully constrain Defendants Silva's and Uhlig's exercise of their delegated authority.  Defendant Uhlig specifically informed Ms. Roe that although CCSD's policies permitted discipline, "it is discretionary depending on the facts and circumstances."  **Ex. 3** at 50.

81.     Defendants Silva and Uhlig would regularly consult with CCSD's legal department concerning decisions, but both testified that they were not bound by the legal department's recommendations.  **Ex. 26** at 187:8-16, 264:8-18; **Ex. 36** at 72:5-15, 87:21-88:20.

## SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact

14

and the movant is entitled to judgment as a matter of law." When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views the record in the light most favorable to the nonmoving party. *Banner Bank v. First Am. Title Ins. Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019).

## ANALYSIS

I.   **Claim 2 – Defendant CCSD Exhibited Deliberate Indifference with Respect to Ms. Doe's Reports of Sexual Assault and Harassment in Violation of Title IX**

Title IX provides, in relevant part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). "[A] recipient of federal funds may be liable in damages under Title IX only for its own misconduct." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 640 (1999). However, even in cases involving student-on-student sexual harassment, a plaintiff may still establish a Title IX violation for a recipient's "*own* decision to remain idle in the face of known student-on-student harassment in its schools." *Id.* at 641 (emphasis in original). To establish school district liability under Title IX, a plaintiff must show that the district or an administrator with authority to take corrective action responded with deliberate indifference to known discrimination in the district's programs. *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1246 (10th Cir. 1999); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). Sexual harassment that is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school" constitutes discrimination under Title IX. *Davis*, 526 U.S. at 650. The 2020 regulations implementing

15

Title IX define sexual harassment constituting discrimination as including *both* the *Davis* definition *as well as* even a single act of "[s]exual assault" as defined under the Clery Act. 34 C.F.R. § 106.30(a) (2020); *see also* 85 FR 30026, 30036 (May 19, 2020) ("[T[he Department's inclusion of sexual assault . . . in the § 106.30 definition of sexual harassment, without requiring those sex offenses to meet the Davis elements of severity, pervasiveness, and objective offensiveness, appropriately guards against, for instance, some sexual assaults . . . being covered under Title IX while other sexual assaults . . . are deemed not to be 'pervasive' enough to meet the Davis standard.").

## A. Defendant CCSD Was Deliberately Indifferent to Plaintiff's Report of Sexual Assault

Defendants admit that CCSD gained actual knowledge of Mr. Jones's sexual assault of Ms. Doe on January 25, 2022.  SMF ¶ 9.  It is also undisputed that Mr. Jones's sexual assault involved his digital penetration of Ms. Doe's vagina without her consent. SMF ¶ 7.  This act constitutes "sexual assault" under the Clery Act.  29 U.S.C. § 1092(f)(6)(A)(v); *see also* SMF ¶ 8 (CCSD's Title IX training on the 2020 regulations). Thus, CCSD had actual knowledge of sexual harassment under Title IX.

### i. *Substantial Control over the Context of Mr. Jones's Sexual Assault*

Under *Davis*, a recipient's liability is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645.  However, crucially, this does not by itself mean that recipients are only liable if the known sexual harassment occurs on their property.  Courts have repeatedly found that schools have exercised substantial control even when the initiating harassment occurred off-campus, as in this case.  *See, e.g.*, *Brown v. Ariz.*, 82 F.4th 863 (9th Cir. 2023); *Roe v. Marshall Univ. Bd. of Governors*, 668

16

F. Supp. 3d 461 (S.D.W. Va. 2023); *DeGroote v. Ariz. Bd. of Regents*, 2020 WL 10357074 (D. Ariz. Feb. 7, 2020).

*Brown v. Arizona*, 82 F.4th 863 (9th Cir. 2023), is particularly on point here in light of its many factual parallels to this case. In *Brown*, a college football player assaulted multiple women in his off-campus apartment. *Id.* at 867-72. In concluding that the plaintiff had submitted sufficient evidence to allow a reasonable factfinder to conclude that the university had "substantial control" over the "context" of the harassment, *id.* at 879, the Court relied upon three principal evidentiary showings. First, the university had control over the off-campus housing in which the assaults occurred because the defendant required permission to live off campus, which was "conditioned on good behavior and could be revoked" for "behavior as innocuous as being late to appointments or receiving bad grades." *Id.* at 878. "The very existence of this off-campus players' residence was therefore subject to the coaches' control." *Id.* Second, because the university's student code of conduct "applies to student conduct 'both on-campus and off-campus,'" the university's "rules and sanction authority created" the necessary "element of school sanction, sponsorship, or connection to a school function . . . required for a school to control an off-campus context." *Id.* (internal quotation marks omitted). Third, the defendant was "subject to increased supervision through Player Rules specific to football players." *Id.* at 879. The "heightened level of control and disciplinary power" demonstrated by these rules "strengthened the connection" between the defendant's off-campus housing and the university. *Id.*

Ms. Doe's case presents strikingly similar considerations. Although the sexual assault occurred off-campus, Mr. Jones was only permitted to leave during the school

day because of his off-campus privileges, granted by the school and conditioned on good behavior.  SMF ¶¶ 67-68.  His very presence off campus was therefore subject to CCSD's control.  CCSD's own code of conduct and Participation Agreement similarly extended CCSD's disciplinary authority to off-campus conduct, with even more rules specific to student athletes.  SMF ¶¶ 70, 74.  The evidence reflects that CCSD applied these codes of conduct to discipline wide swathes of off-campus behavior, including shoplifting, fighting, drug use, and even generalized disruptive behavior.  SMF ¶¶ 71-73; *cf. Marshall Univ. Bd. of Governors*, 668 F. Supp. 3d at 467 (institution's disciplinary action against other students in a setting evidenced substantial control over the context of a sexual assault in the same setting); *S.C. v. Metro. Gov't of Nashville & Davidson Cty.*, 579 F. Supp. 3d 999, 1034 (M.D. Tenn. 2022) (same).  Indeed, CCSD ultimately disciplined Mr. Jones specifically for his "[b]ehavior on or off campus" in accordance with CCSD's policies.  SMF ¶ 66.  Thus, CCSD maintained substantial control over the context of Mr. Jones's sexual assault of Ms. Doe.

   ii.    *Deliberate Indifference*

A school is deliberately indifferent to known sexual harassment if its "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."  *Davis*, 526 U.S. at 648.  CCSD's responses, and notable lack thereof, to Ms. Doe's report were clearly unreasonable.

CCSD's responses to Ms. Doe's report of sexual assault can be counted on one hand: (1) Ms. Doe was provided with an "emotional support adult"—her Dean—and permission to leave class at any time to go to her office, SMF ¶ 12; (2) CCSD offered Ms. Doe a no-contact agreement on **one** occasion and never again, without fully explaining

its contours, SMF ¶¶ 13, 16, 19-20; and (3) CCSD ensured that Ms. Doe and Mr. Jones would not be scheduled for any shared classes in the subsequent school year, SMF ¶ 26. Each of these supportive measures were strikingly inadequate, both *ab initio* and as could be seen over the school year as Ms. Doe continued to struggle to access her education.

CCSD's provision of Dean Devitt as an "emotional support adult" was not only inadequate and ineffective, but it ran directly counter to the goals of Title IX. CCSD informed Ms. Doe that, at any time she felt the need, she could leave class and report to Dean Devitt's office. SMF ¶ 12. On at least some occasions, Dean Devitt would not even be available to speak, at which point Ms. Doe would simply remain in the waiting area for an indefinite period of time while missing class. SMF ¶ 25. The record reflects that Ms. Doe continued leaving class to go to Dean Devitt's office throughout the semester as she continued to need support. SMF ¶ 24. The Tenth Circuit has confirmed that "it is not enough to try to help a student cope with the misbehavior of other students." *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1313 (10th Cir. 2020) (citing *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 690 (4th Cir. 2018) ("[U]niversity administrators listening to students' reports of harassment and threats is an important step in seeking to rectify a sexually hostile environment. But the mere act of listening to students is not a remedy in and of itself."). Further, it is notable that Ms. Doe was specifically permitted to, and did, *leave* classes to visit Dean Devitt. SMF ¶¶ 12, 24. This conflicts with the goals of Title IX, which center on ensuring that students are able to access educational benefits and opportunities regardless of sex. *Davis*, 526 U.S. at 650. CCSD even testified that, "If CCSD were aware that a sexual assault survivor were regularly missing class due to the impacts of the sexual assault, it would be *clearly unreasonable* not to address the situation

by finding supportive measures to improve their access to the classroom[.]" SMF ¶ 60 (emphasis added). Yet CCSD did no such thing. Instead, as Ms. Doe continued to skip class to visit Dean Devitt, and as her mother continued to report Ms. Doe's emotional and physical struggles at school, CCSD merely maintained the status quo without reevaluation. This one-and-done approach in the face of restricted educational access is clearly unreasonable. *See Sch. Dist. No. 1*, 970 F.3d at 1314 ("[T]he authorities knew that what they had been doing (if anything) had not sufficed. Failure of authorities to try something else can show deliberate indifference.") (citing *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 262 (6th Cir. 2000) (similar); *Wills v. Brown Univ.*, 184 F.3d 20, 26 (1st Cir. 1999) (similar)).

CCSD's one-time offer of a no-contact agreement right after Ms. Doe's initial report was a similarly threadbare supportive measure. A no-contact agreement is a measure initiated and enforced by the school to prevent students from engaging with one another; unlike a criminal protective order, the school would have authority to implement and enforce the agreement as appropriate to the school environment. SMF ¶¶ 14, 17, 21. As Ms. Doe and Dean Devitt testified, Ms. Doe initially declined the no-contact agreement because her family was pursuing a criminal protective order and because she did not want the school to contact Mr. Jones at that point, as he had not yet learned that she had reported the assault to the police. SMF ¶ 18. However, CCSD never offered a no-contact agreement or other safety plan at any point thereafter, including after Ms. Doe reported two alleged violations of the criminal protective order in the school's athletic training facilities. SMF ¶¶ 19, 47. 49. CCSD has been clear that it does not enforce protection orders at school, considering that a matter for students to handle with the police. SMF ¶

17.   Nor did Defendants ever inform Ms. Doe that CCSD would not be enforcing the criminal protective order.  SMF ¶¶ 16-17, 20.  A no-contact agreement, though, would have governed and protected Ms. Doe during CCHS's copious unstructured time.  SMF ¶¶ 14-15.  CCSD testified that, "It would be clearly unreasonable to have done anything less than . . . putting in a no-contact agreement and ensuring that the students had full access to their deans for check-ins" and that doing so would be "in line with what we would do with any other student in . . . this similar situation."  SMF ¶ 62.  Yet, again, CCSD did no such thing here, even where CCSD would have had the authority to impose a no-contact agreement or safety plan even absent student agreement.  SMF ¶ 21.  Defendants further could have implemented a specific movement plan to prevent or minimize contact between Ms. Doe and Mr. Jones outside of class times.  SMF ¶ 15.

Finally, CCSD ensured that Ms. Doe and Mr. Jones would not be in any classes together in the following year.  SMF ¶ 26.  While it was necessary to prevent them from sharing a classroom, CCSD's employment of this supportive measure merely calls into relief how CCSD took no steps to separate Ms. Doe and Mr. Jones during non-class time.

The steps that CCSD did *not* take in response to Ms. Doe's report are also clearly unreasonable.  For instance, it did not investigate the sexual assault *at all*.  SMF ¶ 42.  Nor did it discipline Mr. Jones until he entered a guilty plea in his criminal case, months after Ms. Doe withdrew.  SMF ¶¶ 64-65.  CCSD's justification for such is inherently contradictory: CCSD claimed that it could not have investigated Mr. Jones under Title IX because it believed Title IX did not apply to the sexual assault, but it also could not discipline him prior to an adjudication of his guilt because of Title IX's application.  SMF ¶¶ 43-44.

Another potential response to Ms. Doe's report would have been for the school to offer mental health services to Ms. Doe. CCSD testified that counseling and mental health services would be a core supportive measure offered to a survivor of sexual assault to restore lost educational opportunities. SMF ¶ 58. However, the record does not show that any such services were offered to Ms. Doe at any point, SMF ¶ 59; *see also* SMF ¶ 57 (any offer of supportive measures would be reflected in a student's file).

Based on CCSD's inadequate actions and striking inactions in response to Ms. Doe's report of sexual assault, there is no genuine dispute of fact that CCSD responded in a clearly unreasonable manner amounting to deliberate indifference.

## B. Defendant CCSD Was Deliberately Indifferent to Plaintiff's Report of Sexual Harassment

Ms. Doe's claim of Title IX deliberate indifference as to bullying and harassment follows the more conventional *Davis* test, which requires a plaintiff to establish that "the district (1) had actual knowledge of, and (2) was deliberately indifferent to (3) harassment that was so severe, pervasive and objectively offensive that it (4) deprived the victim of access to the educational benefits or opportunities provided by the school." *Murrell*, 186 F.3d at 1246 (citing *Davis*, 526 U.S. at 642-46).

There is no genuine dispute of fact that CCSD had actual knowledge that Ms. Doe was being subjected to bullying and harassment as of May 13, 2022, at the latest. SMF ¶¶ 50-51. Nor can it be disputed that its response to such was clearly unreasonable. CCSD testified that "it would be incumbent at that time for the school district to take proactive measures to learn more about that harassment and to remedy that harassment." SMF ¶ 54. Defendant Silva testified that he cannot ignore reports of bullying and that he would have delegated investigation and remediation to Defendant

22

Uhlig.  SMF ¶ 52.  He described having had conversations with Defendant Uhlig about the situation and testified that he would have expected Dean Devitt to at least speak with Ms. Doe about the bullying.  SMF ¶¶ 52-53.  However, no one took any steps to prevent or halt such harassment, and Defendants even denied receiving notice at all until well into this litigation.  SMF ¶¶ 55-56.

This mirrors *Doe v. School District Number 1*, 970 F.3d 1300 (10th Cir. 2020), where the 10th Circuit reversed the granting of a motion to dismiss a deliberate indifference claim.  The court in that case relied on three primary factors in favor of deliberate indifference.  First, the plaintiff "alleges continual harassment despite her repeated reports to school authorities.  Thus, the authorities knew that what they had been doing (if anything) had not sufficed."  *Id.* at 1314.  Second, the school district engaged in no investigation at all, as here.  *Id.*  Third, "the administrators' refusal to take Ms. Doe's complaints seriously is reflected in their failure to document them.  Nothing regarding the harassment was recorded in Ms. Doe's school file[.]"  *Id.*  Just as in *School District Number 1*, CCSD's failure to take any action whatsoever in response to learning that Ms. Doe was experiencing bullying and harassment following her report of Mr. Jones's sexual assault – including failing to document such – was clearly unreasonable.

Next, the undisputed evidence establishes that the harassment Ms. Doe faced was so severe, pervasive, and objectively offensive that it deprived her of equal educational opportunities.  Courts in this district frequently evaluate these factors together.  *See, e.g.*, *Forth v. Laramie Cty. Sch. Dist. No. 1*, 85 F.4th 1044, 1053 (10th Cir. 2023) (formulation of elements combining these factors); *Sch. Dist. No. 1*, 970 F.3d at 1312 ("Adding to the evidence that the harassment was severe and pervasive are the allegations regarding the

impact of the harassment on Ms. Doe and the evaluations of third parties."); *A.C. as next friend S.T.C. v. Jefferson Cty. R-1 Sch. Dist.*, 721 F. Supp. 3d 1162, 1183 (D. Colo. 2024); *Robert R. v. Jefferson Cty. Sch. Dist. R-1*, 2022 WL 4104273, at *3 (D. Colo. Sept. 8, 2022).

From shortly after reporting Mr. Jones's assault through the end of the school year, Ms. Doe was subjected to frequent, if not constant, bullying. Football players would publicly accuse her of lying in the halls; other female students would tell her it was normal to be sexually assaulted and she should not be upset; her classmates would throw paper at her during classes with derogatory messages. SMF ¶¶ 32-33. Students would tell her that she should drop out. SMF ¶ 33. On one occasion, approximately six or seven football players circled around Ms. Doe and physically blocked her from leaving, asking her intrusive questions and calling her rude names until her friend helped her escape. SMF ¶ 34. This conduct persisted for months and was only halted by the end of the school year and, later, Ms. Doe's decision to withdraw from CCSD.

This sustained campaign of harassment unquestionably denied Ms. Doe equal access to educational opportunities. In addition to Ms. Doe's frequently leaving class to visit Dean Devitt's office, as described above, she also went to great lengths to avoid other students throughout the day. She changed her routes for walking between classes so that football players would not know where she was, and she spent mornings before school, lunch periods, and the time between classes hiding in the bathroom to avoid other students. SMF ¶¶ 35-36. Ms. Doe ultimately withdrew from CCSD entirely, in part due to this harassment. SMF ¶ 64. The widespread and near-daily bullying Ms. Doe experienced was severe and pervasive, preventing her from engaging in educational

24

opportunities.  SMF ¶¶ 35-36.  *See, e.g.*, *Sch. Dist. No. 1*, 970 F.3d at 1312-13 (student avoiding classes and social interactions after months of name calling experienced sufficiently severe and pervasive harassment denying her equal access to education despite maintaining a 4.0 GPA); *id.* ("And there is certainly a body of thought that the socialization from attending school with peers is an important, perhaps essential, advantage of the school experience.").

Based on the arguments raised under Part I, Plaintiff seeks summary judgment on the Second Claim for Relief of her Second Amended Complaint.  ECF No. 100.

## II. Claim 3 – Defendant CCSD's Final Policymakers Exhibited Deliberate Indifference to Known Sexual Harassment in Violation of Ms. Doe's Equal Protection Rights

The Fourteenth Amendment to the United States Constitution provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  A school district violates this constitutional right when it maintains an official policy of deliberate indifference to sexual harassment.  *Murrell*, 186 F.3d at 1250-51.  "In order to establish municipal, or in this case School District, liability for sexual harassment under the Fourteenth Amendment, a plaintiff must demonstrate that a state employee's discriminatory actions are representative of an official policy or custom of the municipal institution, or are taken by an official with final policy making authority."  *Id.* at 1249.  In other words, a governmental entity's "policy can also be established pursuant to a specific and one-time decision made by a 'final policymaker.'" *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995); *see also Pembauer v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("[M]unicipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among

various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

"Whether an individual is a final policymaker for purposes of § 1983 liability is a legal issue to be determined by the court based on state and local law." *Vogt v. City of Hays*, 844 F.3d 1235, 1251 (10th Cir. 2017) (citation and internal quotation marks omitted). The Tenth Circuit has identified "three elements that help determine whether an individual is a 'final policymaker': (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final— *i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle*, 69 F.3d at 448 (citation and internal quotation marks omitted).

Defendants Silva and Uhlig each had final policymaking authority with respect to many matters pertinent to this case, and their exercise of such authority denied Ms. Doe equal protection of the laws. *See Pembaur*, 475 U.S. at 483 ("[P]articular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances.").

At all pertinent times, Defendant Uhlig has served as CCHS's Title IX Coordinator, in which role he is responsible for receiving Title IX complaints, conducting and overseeing investigations, and ensuring the provision of adequate supportive measures to students in need. SMF ¶¶ 78-79. Defendant Uhlig was explicitly granted this authority through his appointment as Title IX Coordinator, his decisions were not subject to any review, and Defendants admit that although he regularly consulted with CCSD's legal department, he was not constrained by its advice. SMF ¶¶ 80-81. Accordingly,

26

Defendant Uhlig exercised final policymaking authority with respect to the decision to dismiss Ms. Doe's Title IX complaints without investigation, the provision of inadequate supportive measures to ensure that Ms. Doe was able to access her education on the same terms as male students like Mr. Jones, and the decision to consciously acquiesce in the bullying and harassment suffered by Ms. Doe.

Defendant Silva, meanwhile, was explicitly granted authority to discipline students according to school policies, such as the student code of conduct and the Participation Agreement, and to impose suspensions of up to ten days.  SMF ¶ 75-77.  He was specifically designated as the individual responsible for receiving and initially acting upon student allegations of sexual harassment.  SMF ¶ 75.  Within his delegated disciplinary authority, Defendant Silva's discretion was neither meaningfully reviewed nor subject to binding policy guidance.  SMF ¶¶ 80-81.

The standard for deliberate indifference does not differ between the Title IX and Equal Protection contexts.  *See Doe v. Jefferson Cty. Pub. Schs.*, 2025 WL 1892447, at *5 (D. Colo. Feb. 27, 2025), *report and recommendation adopted*, 2025 WL 1892444 (D. Colo. June 17, 2025) (collecting cases).  Thus, for the same reasons that Defendants' actions were clearly unreasonable responses to reported sexual harassment under Part I, the actions of Defendants Silva and Uhlig constitute deliberate indifference to sexual harassment for purposes of Plaintiff's Equal Protection claim against CCSD as well.

Based on the arguments raised under Part II, Plaintiff seeks summary judgment on the Third Claim for Relief of her Second Amended Complaint.  ECF No. 100.

27

**III.     Claim 4 – The Individual Defendants Consciously Acquiesced in Known Sexual Harassment in Violation of Ms. Doe's Equal Protection Rights**

"[A] governmental official or supervisory employee may be held liable under section 1983 upon a showing of deliberate indifference to known sexual harassment." *Murrell*, 186 F.3d at 1250.  In other words, school officials may be held liable when they know about sexual harassment and "acquiesce[] in that conduct by refusing to reasonably respond to it."  *Id.*  Again, because the actions of Defendants Silva and Uhlig—namely, dismissing Ms. Doe's Title IX complaints, refusing to investigate her report of sexual assault, offering patently inadequate supportive measures, engaging in no discipline of Mr. Jones until after Ms. Doe's withdrawal from CCSD, and taking absolutely no actions in response to reports of bullying and sexual harassment—were deliberately indifferent, they are individually liable under Ms. Doe's Equal Protection claim.

Based on the arguments raised under Part III, Plaintiff seeks summary judgment on the Fourth Claim for Relief of her Second Amended Complaint.  ECF No. 100.

<u>**CONCLUSION**</u>

For the reasons set forth above, Ms. Doe respectfully requests that this Court grant summary judgment as to the Second, Third, and Fourth Claims for Relief as set forth in her Second Amended Complaint [ECF No. 100].

Respectfully submitted this 10th day of April 2026.

SPARK JUSTICE LAW LLC

*s/ Stephen Shaw*
Laura B. Wolf
Stephen Shaw
4045 S. Broadway, Suite 208
Englewood, CO 80113
(303) 802-5390 (t) / (303) 848-3003 (f)
laura@spark-law.com
steve@spark-law.com

ALR Civil Rights LLC
Aurora L. Randolph
9878 W. Belleview Ave., Suite 2129
Denver, CO 80123
(303) 968-1703 (t)
aurora@alrcivilrights.com

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of April 2026, I electronically filed the foregoing **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system and served on the following:

Holly E. Ortiz
Megan R. Brooks
SEMPLE, FARRINGTON, EVERALL & CASE, P.C.
1120 Lincoln Street, Suite 1308
Denver, CO 80203
(303) 595-0941
hortiz@semplelaw.com
mbrooks@semplelaw.com

*Attorneys for Defendants*

Further, and pursuant to the Court's Standing Order Regarding the Use of Generative Artificial Intelligence in Court Filings, undersigned counsel certifies that generative artificial intelligence was not used in any manner to draft this Motion.

*s/ Stephen Shaw*
Stephen Shaw